1999-NMCA-106

986 P.2d 1122

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Skip T. CHAPMAN, Defendant–Appellant.**

**No. 19,525.**

Court of Appeals of New Mexico.

June 16, 1999.

Certiorari Denied, No. 25,832, June 16, 1999.

Michael Kiernan, David G. Crum & Associates, Albuquerque, for Appellant.

Patricia A. Madrid, Attorney General, William McEuen, Assistant Attorney General, Santa Fe, for Appellee.

*OPINION*

SUTIN, Judge.

{1} Skip T. Chapman (Defendant) appeals the judgment and sentence entered after he pled guilty to one count of possession of methamphetamine with intent to distribute. In his conditional plea agreement, Defendant reserved the right to appeal the trial court's denial of his motion to suppress evidence of methamphetamine obtained during the stop of an automobile in which he was a passenger. Defendant argues that the evidence was the tainted fruit of an earlier unlawful patdown search. In addition, Defendant argues that his consent to the search of his bag was not voluntary and that the deputy did not have the driver's consent to open the trunk of the car in order to search Defendant's bag. We affirm.

*FACTUAL AND PROCEDURAL BACKGROUND*

{2} This case involves two separate, but related searches. The first occurred on September 2, 1997. On that date, Deputy Greenlee observed Defendant driving without his seat belt fastened and pulled Defendant over. The deputy asked Defendant for his driver's license and registration. Defendant would not make eye contact with the deputy.

When Defendant handed his driver's license to the deputy, Defendant's hand was shaking. The deputy then had Defendant exit his vehicle. Because the deputy noticed that Defendant was becoming increasingly nervous, he asked Defendant if he had any weapons. Defendant told the deputy that he did not have any weapons. Then, in a higher-pitched voice, and in a nervous and aggressive manner, Defendant asked "what this was all about." The deputy characterized Defendant's tone of voice and questioning at that point as hostile, nervous, and aggressive. The deputy then asked Defendant whether he had any drugs, drug paraphernalia, or needles on him. The deputy asked this because he was afraid of getting stuck with a dirty needle if he conducted a patdown search. With this question, Defendant's body began to shake. The deputy asked Defendant to place his hands on the car. Defendant complied, but his hands were shaking so furiously that he was unable to keep them steady. At this point, the deputy, who had no backup, became concerned about his own safety and decided to conduct a patdown search for weapons to protect himself. Although the deputy requested Defendant's consent for the patdown, Defendant never consented.

{3} During the patdown search for weapons, the deputy felt a small vial in one of Defendant's front pockets. The deputy recognized the shape of the vial immediately and without any manipulation. Based on his past experience and training, the deputy knew that this particular type of vial is commonly used to hold contraband, usually cocaine, methamphetamine, or heroin. The deputy then removed the vial from Defendant's pocket, identified the contents of the vial as methamphetamine, and arrested Defendant for possession of methamphetamine. As a consequence of this arrest, Defendant's car was impounded, pursuant to NMSA 1978, § 30–31–34(D) (1989).

{4} After being released on bond, Defendant and a friend, Ms. Morrison, drove to the car lot where Defendant's car was impounded. Defendant had received permission from the Chief Deputy to remove certain personal items from the vehicle, such as suitcases and clothing. The owner of the lot observed Defendant removing other items from the car, including the car's bra and dash mat. Believing that Defendant was not entitled to remove those other items, the lot owner called the Sheriff's Department and informed it that Defendant had taken the items from the car and that he was leaving the lot with Ms. Morrison in a bronze, older-model Oldsmobile.

{5} Deputy Elam had previously transported Defendant to the magistrate court for purposes of allowing Defendant to set bond on his charge of possession of methamphetamine incurred on September 2. After Deputy Elam received the lot owner's report, he testified that he did not seek a search warrant because he believed Defendant and his companion were headed back to Defendant's home state and would take the evidence outside the jurisdiction before he could obtain a search warrant. Deputy Elam and Chief Deputy Benavidez began to look for a car matching the description provided by the lot owner, and soon observed such a car with a female driver and male passenger. Neither the driver nor the passenger was wearing a seat belt, and Deputy Elam pulled them over to issue a citation for failure to wear a seat belt and, if appropriate, to investigate items removed from Defendant's vehicle. Once Deputy Elam approached the car, he recognized Defendant as someone he had transported one day earlier.

{6} When Deputy Elam asked the driver for her license and registration, she was shaking uncontrollably. Because of the driver's nervousness, Deputy Elam questioned her about her travel plans, about who owned the car she was driving, about what items she was responsible for in that car, and about the items taken from the impounded car. Deputy Elam asked the driver if she would consent to a search of the car, but she said that she could not give consent because the car did not belong to her.

{7} Deputy Elam then began questioning Defendant about the items taken from the impounded car. Defendant admitted that he had taken the bra and the dash mat, but also stated that he believed he was allowed to take those items because they were his per-

sonal property. Defendant also admitted that he had removed a bag from the impounded car. Deputy Elam explained to Defendant that he had only been given permission to remove personal property from the vehicle and told Defendant that he needed to recover the bra and dash mat because they belonged to the State. He explained to Defendant that once he recovered those items. Defendant would be "free to go." The deputy then asked Defendant for consent to search the car and Defendant's bag for those items. Defendant said that he did not believe the deputy needed to search the car; however, Defendant agreed to allow the deputy to search his bag. After giving his consent, Defendant got out of the car. Deputy Elam then asked where the bag was, and Defendant motioned toward the trunk with his arm, indicating that the bag was in the trunk.

{8} The driver initially refused to open the trunk and would not give the car keys to the deputy, even though Defendant told the driver that he had given the deputy permission to search his bag. When the deputy informed the driver that he would arrest her for interfering with his investigation, she handed the keys to the deputy, and he opened the trunk.

{9} Deputy Elam saw a rolled-up dash mat in the trunk. As he picked the dash mat up, a blue nylon bag fell out. The zipper of the nylon bag was open slightly and the deputy observed a clear plastic bag containing a substance that looked like methamphetamine. The deputy then drew his weapon and had Chief Deputy Benavidez arrest Defendant and the driver for possession of methamphetamine.

{10} Defendant filed two suppression motions. The first motion sought to suppress the evidence of methamphetamine discovered in the search on September 5, 1997. The second motion sought to suppress the vial of methamphetamine uncovered during the search on September 2, 1997. During the suppression hearing, the trial court viewed a videotape of the September 5 stop. Defendant has not made the videotape part of the record on appeal. After hearing the testimony, viewing the tape, and listening to

the arguments of counsel, the trial court denied both motions. Defendant then entered a conditional plea agreement that reserved the right to appeal the denial of his first suppression motion. Defendant now appeals.

## DISCUSSION

{11} Defendant raises three arguments for reversing the trial court's denial of his first suppression motion: (1) the trial court erred in concluding that the evidence obtained in the September 5 search was not the tainted fruit of an unlawful earlier search; (2) the trial court erred by finding that Defendant voluntarily consented to opening the trunk or to searching his bag; and (3) the trial court erred by finding that the deputy could open the trunk to search Defendant's bag without the driver's consent.

## STANDARD OF REVIEW

{12} We review the denial of a motion to suppress to determine "whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party; all reasonable inferences in support of the court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." *State v. Boeglin,* 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983). Under this standard of review, we are not bound by the trial court's ruling if it is based on an error of law. *See id.* Here, the trial court denied the motion to suppress, concluding that Defendant's Fourth Amendment rights were not violated. Because the trial court correctly applied the law to the facts, we affirm.

**The Evidence Discovered on September 5 Was Not the Product of an Earlier Unlawful Search**

{13} Defendant argues that the evidence discovered on September 5 is inadmissible as tainted fruit of the poisonous tree because the Sheriff's Department would never have been looking for Defendant on that date had he not been unlawfully searched and had his car not been impounded on September 2. According to Defendant, the September 2 search was unlawful because the deputy's question about drugs and guns and the pat-

down search were impermissible when the deputy stopped Defendant for failing to wear a seat belt. We disagree that the questions and patdown search on September 2 were unlawful and therefore conclude that the evidence obtained on September 5 was not tainted.

{14} The heart of Defendant's position that the September 2 search was unlawful is that the deputy exceeded the scope of his authority under *City of Albuquerque v. Haywood,* 1998–NMCA–029, 124 N.M. 661, 954 P.2d 93, because the deputy's questions about drugs and guns and the patdown search were unrelated to the reason for the stop. Defendant reads *Haywood* too narrowly. In *Haywood,* we affirmed the suppression of evidence obtained during an investigatory stop because the officer's questions regarding weapons were unrelated to the circumstances that justified the stop in the first place, because there was no evidence indicating that Haywood was involved in illicit activity when the officer inquired about weapons, *and* because nothing occurred during the lawful portion of the stop that would have justified the expanded questioning. *Id.* ¶¶ 15–16, 18.

{15} We explained in *State v. Taylor,* 1999–NMCA–022, ¶ 21, 126 N.M. 569, 973 P.2d 246, that "an officer's suspicions may broaden during an investigatory stop to include matters unrelated to the initial reason for the stop" and that an officer may pursue those matters if they "cause the officer reasonable suspicion." But, "[a]ny questioning and searching for weapons during a stop made to investigate unrelated matters must be based on specific, articulable facts, not unsupported intuitions or inarticulate hunches." *Id.* ¶ 23. Thus, *Haywood* and *Taylor* are consistent with our rule that "[d]uring an investigatory stop, when an officer *reasonably* believes the individual may be armed and dangerous, [the officer] may check for weapons to ensure personal safety." *State v. Flores,* 1996–NMCA–059, ¶ 17, 122 N.M. 84, 920 P.2d 1038 (emphasis added). *Haywood* and *Taylor* merely emphasize that an officer's belief that a motorist is dangerous must be based on identifiable, articulable facts before a court will consider the belief

reasonable. These facts may include a description of the behavior and appearance of the individual stopped. *Cf. State v. Estrada,* 111 N.M. 798, 801, 810 P.2d 817, 820 (Ct.App. 1991) (explaining that a motorist's behavior and appearance are factors to be considered when deciding whether an officer had reasonable suspicion of criminal activity necessary to justify prolonging the detention of motorist at a border checkpoint).

{16} Here, unlike in *Haywood,* the deputy articulated several facts concerning Defendant's behavior, demeanor, and attitude during the stop that justified his question about weapons and the patdown search. The deputy provided more than conclusive characterizations of Defendant. *See United States v. Crawford,* 891 F.2d 680, 683 n. 4 (8th Cir.1989) ("The statement that [defendant] appeared nervous ... is a mere rephrasing of the other evidence, offered in an attempt to enhance the value of that evidence. This court must consider only specifically articulated facts."). Instead of just describing Defendant as nervous, the deputy identified specific behaviors and changes in Defendant's demeanor and attitude that explain why he believed that Defendant might be armed and dangerous. These specific facts provided the trial court with enough information to decide that the deputy's belief was reasonable.

{17} Here, Defendant did not make eye contact with the deputy, even at the beginning of the stop. Defendant's hand shook as he handed over his driver's license. The deputy testified that in his experience most other motorists are not this nervous when he stops them for a seat belt violation. According to the deputy, most other motorists stopped for seat belt violations are conversational, make eye contact, and do not shake. Because Defendant was considerably more nervous than most people who are stopped for not wearing their seat belts, the officer asked Defendant if he had any weapons. These facts—failure to make eye contact, shaking hands, and unusual level of nervousness—were sufficient to allow the deputy to ask Defendant whether he had any weapons on him. *Cf. United States v. Rascon–Ortiz,* 994 F.2d 749, 753 (10th Cir.1993) (holding

that the motorist's nervousness, exhibited by his shaking hands, constituted a suspicious circumstance that entitled the border patrol agent to prolong the motorist's detention); *State v. Cohen*, 103 N.M. 558, 561, 711 P.2d 3, 6 (1985) (including the nervousness of the motorist among the facts that made prolonging the detention in order to seek consent reasonable); *State v. Eskridge*, 1997-NMCA-106, ¶¶ 23-25, 124 N.M. 227, 947 P.2d 502 (holding defendant's physical appearance and specific actions and conduct led officer to reasonably believe that a patdown search was necessary for officer safety); *State v. Galloway*, 116 N.M. 8, 9-10, 859 P.2d 476, 477-78 (Ct.App.1993) (considering the nervousness of the driver at a border patrol checkpoint, along with other factors, when deciding that the officer had reasonable suspicion to prolong the detention).

{18} When Defendant responded to the deputy's question about weapons, his voice was higher-pitched than when he was in the car, and he asked, in an anxious and aggressive manner, "what this was all about." The officer described Defendant's tone of voice and questioning at that point as nervous, hostile, and aggressive. The officer testified that, at that point, he thought he might need to pat Defendant down, and he did not want to be pricked with a dirty needle. He, therefore, asked Defendant whether he had any drugs, paraphernalia, or needles. Upon this further questioning, Defendant's body began to shake. When asked to place his hands on the vehicle, Defendant's hands shook so violently that he was unable to keep them steady. Defendant's uncontrollable shaking, the change in the pitch of his voice, and the fact that most people do not respond this way when stopped for a seat belt violation, prompted the deputy to conduct a patdown search to protect himself. Based on these concrete examples of Defendant's nervousness and hostility, and the federal and state case law holding that nervousness is a factor to be considered when deciding whether a detention was reasonable, we hold that the trial court did not err in concluding that the deputy reasonably believed that Defendant might be armed and dangerous. *See Rascon-Ortiz*, 994 F.2d at 753; *Cohen*, 103 N.M. at 561, 711 P.2d at 6; *Eskridge*, 1997-

NMCA-106, ¶¶ 23-25, 124 N.M. 227, 947 P.2d 502; *Galloway*, 116 N.M. at 9-10, 859 P.2d at 477-78. In addition, contrary to the situation in *Taylor*, the deputy here articulated a specific reason for asking about drug paraphernalia. Therefore, the patdown was legal.

## Defendant's Consent to the Search of His Bag Was Voluntary

{19} Defendant next argues that the trial court erred by denying his motion to suppress the evidence of methamphetamine discovered in the search of his bag on September 5 because Defendant did not voluntarily consent to this search. We review the trial court's factual determination that Defendant's consent was voluntary, given the totality of the circumstances, for substantial evidence. *See State v. Anderson*, 107 N.M. 165, 168, 754 P.2d 542, 545 (Ct.App.1988). If substantial evidence supports the trial court's result, we will affirm. *See id.* The voluntariness of consent is a question of fact involving "a three-tiered analysis: (1) there must be clear and positive testimony that the consent was specific and unequivocal; (2) the consent must be given without duress or coercion; and (3) the first two factors are to be viewed in light of the presumption that disfavors the waiver of constitutional rights." *Id.* at 167, 754 P.2d at 544.

{20} Substantial evidence exists of clear and positive testimony that the consent was specific and unequivocal. The uncontradicted, unimpeached testimony of the deputy was that Defendant admitted without hesitation to having the car bra and dash mat, and that when he asked Defendant if he could search the bag, Defendant said yes and got out of the car, and motioned toward the trunk, where the bag was located. The deputy's testimony concerning Defendant's consent is substantial evidence.

{21} Substantial evidence also demonstrates that Defendant's consent was not the product of duress or coercion. To define duress or coercion in the context of consent to search, we have looked to the case law on coerced confessions. *See State v. Ruud*, 90 N.M. 647, 650-52, 567 P.2d 496, 499-501 (Ct.

App.1977) (analogizing the voluntariness of consent to the voluntariness of a confession). Coercion involves police overreaching that overcomes the will of the defendant. *See State v. Fekete,* 120 N.M. 290, 299, 901 P.2d 708, 717 (1995) (holding that a confession is not involuntary because of police coercion unless there is police overreaching). The two deputies here did not use force; did not display their weapons before the consent was given; did not threaten Defendant with violence, arrest, or unwarranted prosecutions; did not subject Defendant to lengthy or abusive questioning; and did not promise leniency in exchange for consent. *See Ruud,* 90 N.M. at 650–52, 567 P.2d at 499–501 (in deciding whether a consent was involuntary due to coercion or duress, the court considered those factors that render a confession involuntary due to coercion or duress, such as a threatening display of weapons, improper use of force, deprivation of food and water, an improper promise of leniency, or threat to prosecute for crimes not committed).

{22} Defendant contends that his consent was coerced because the deputy implied that leniency would be given in exchange for consent by repeatedly commenting that Defendant would be "free to go" once the deputy recovered the bra and dash mat. We question whether such an offer would render a consent to search involuntary. *See State v. Shaulis–Powell,* 1999–NMCA–090, ¶¶ 14–15, 127 N.M. 667, 986 P.2d 463. However, we need not decide the issue here. The taped transcript provides substantial evidence to support the trial court's conclusion that the deputy "was sincere in his offer to let [Defendant] go upon recovery of the items and did not make this promise in an effort to gain consent." Nothing in the record demonstrates that the deputy repeatedly told Defendant that he would be free to go, as Defendant asserts. Without repetition, badgering, or pressure of some kind, the deputy's statement was not a coercive promise of leniency. *Cf. State v. Garcia,* 250 Kan. 310, 827 P.2d 727, 728, 732–33 (1992) (holding substantial evidence supported trial court's finding that consent to search vehicle was coerced where police officer repeatedly asked defendant whether he would consent to search his car in addition to other circumstances of defendant's detention).

{23} The evidence demonstrates that the deputies did not obtain consent to search Defendant's bag by overcoming his will. Indeed, Defendant asserted his will by refusing consent to search the entire car at the same time that he verbally assented to the search of his bag. Defendant's ability to limit the search demonstrates that the deputies did not overcome his will. Therefore, Defendant's consent was voluntary, not coerced.

{24} Finally, no evidence exists to suggest that Defendant was under duress when he consented to the search. Defendant contends that he was nervous because he had been arrested and questioned by the police three days earlier, and further suggests that simply "being subjected to questioning by the police would place defendant under duress." We disagree. The September 2 stop, questioning, and arrest were lawful. Lawful, non-coercive police activity does not in and of itself constitute the type of duress that makes consent involuntary.

{25} Substantial evidence exists to support the trial court's conclusion that Defendant specifically and unequivocally consented to the search of his bag, and that Defendant's consent was voluntary, not coerced. In addition, no evidence exists to demonstrate that Defendant was under duress when he consented to the search of his bag. Therefore, we affirm the trial court's determination that Defendant's consent was voluntary.

**Defendant Cannot Obtain Relief for the Alleged Violation of the Driver's Fourth Amendment Rights**

{26} Defendant argues that the trial court erred by concluding that the deputy could lawfully open the trunk of the car to search Defendant's bag notwithstanding the driver's refusal to turn over the keys except upon threat of being arrested for interfering with the deputy's search. According to Defendant, the methamphetamine discovered inside the rolled-up dash mat should have been excluded because the deputy coerced the driver's "consent" (the turning over of the keys). Defendant's argument is untenable. Defendant cannot complain about the

opening of the trunk because he consented to the search, knowing that the item to be searched, his own bag, was in the trunk. Nor can Defendant rely on the deputy's threatened arrest of the driver (whether lawful or not) as a basis for relief. Even if the driver could raise an invasion of her own Fourth Amendment rights because of a possessory interest in the car, an issue that we do not address or decide, that right may not be vicariously asserted by Defendant. *See* *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."). For these reasons, we will not review the merits of this argument.

## CONCLUSION

{27} We conclude that the search on September 2, 1997, was lawful and that the evidence discovered during the September 5, 1997, search was therefore not tainted fruit of a poisonous tree. We also conclude that Defendant's consent to the September 5 search was voluntary. Finally, we decline review of whether the deputy's conduct violated the driver's Fourth Amendment rights by coercing her into handing over the keys to the trunk. We therefore affirm the judgment and sentence.

{28} **IT IS SO ORDERED.**

PICKARD, C.J. and DONNELLY, J., concur.