2002-NMCA-066

48 P.3d 92

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Shawn VANDENBERG, Defendant– Appellant.**

**No. 21,715.**

Court of Appeals of New Mexico.

April 17, 2002.

Certiorari Granted, No. 27,509, June 6, 2002.

Patricia A. Madrid, Attorney General, William McEuen, Assistant Attorney General, Santa Fe, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Vicki W. Zelle, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

ALARID, Judge.

{1} This appeal requires us to decide whether Defendant's constitutional right to be free from unreasonable searches and seizures was violated when Defendant and his companion were detained, and thereafter subjected to a weapons pat down, following a routine traffic stop. We hold that Defendant's Fourth Amendment rights were violated because (1) the officers who conducted the traffic stop had completed the purposes of the traffic stop and lacked a constitutionally adequate basis for further detaining Defendant, and (2) the officers lacked a reasonable

suspicion that Defendant or his companion were armed and dangerous. We therefore vacate the order denying Defendant's motion to suppress.

## BACKGROUND

{2} During the mid-afternoon of July 29, 1999, Defendant Shawn Vandenberg and a companion, Jason Swanson, were driving north on Highway 54 toward Alamagordo in a 1975 blue Monte Carlo belonging to Swanson. Swanson was driving; Defendant was sitting in the front passenger seat. Otero County Deputy Sheriff Benny House noticed Swanson's car as it passed him traveling in the opposite direction. Believing from his brief observation that the car was not displaying a license plate, Deputy House made a U-turn and pursued the car, stopping it two to three miles south of Alamagordo. After stopping the car, Deputy House realized that the car displayed a valid license plate. After explaining why he had stopped the car, Officer House ordered Swanson to produce his driver's license, vehicle registration, and proof of insurance. Deputy House checked Swanson's documentation, finding everything in order.

{3} During the stop, Deputy House asked where Defendant and Swanson were coming from and where they were going. They told Deputy House that they had driven a friend to the El Paso airport and were on their way home. At some point during the stop, another car passed by heading toward Alamagordo. The occupants of this second car "honked and hollered" as they passed. Deputy House assumed that the occupants of the second car were friends of Defendant and Swanson and had accompanied them to El Paso; however he did not ask Defendant or Swanson about the second car.

{4} Just as Deputy House was telling Defendant and Swanson that they were free to go, Deputy Brent Hill pulled up in a narcotics K–9 unit. Deputy House asked Swanson for permission to walk the narcotics dog around Defendants' car. Swanson asked Deputy House whether he was required to give his consent. Deputy House conceded that Swanson did not have to consent. Swanson denied permission, explaining that

he was in a hurry. Defendant and Swanson then resumed their trip.

{5} Deputy House's suspicions had been aroused during the stop. He felt that Defendant and Swanson had acted nervous, especially after he asked for consent to let the narcotics dog circle their car. Deputy House also thought Defendant acted suspiciously by failing to make eye contact with him. Lastly, based on his assumption that the car whose occupants had "honked and hollered" as it passed had come from El Paso with Defendant and Swanson, Deputy House concluded that it was unusual to have taken two cars to El Paso to drop off one friend at the airport.

{6} Deputy House decided to pass along his suspicions as a "courtesy" to other officers patrolling the area. He made a radio call on the Alamogordo Department of Public Safety's (ADPS) radio frequency. ADPS Officer Bruce Roberts responded. Deputy House alerted Officer Roberts to be on the lookout for a blue 1975 Monte Carlo heading north on Highway 54 south of Alamogordo, with two Anglo occupants. Deputy House advised Officer Roberts that the two occupants had seemed nervous, had given an inconsistent story, and had refused to allow a narcotics dog to walk around their car.

{7} A few minutes after receiving Deputy House's radio call, Officer Roberts encountered Swanson's car as it headed north. At this point, Swanson's car was passing through a construction zone within the Alamagordo city limits where the posted speed dropped to 25 miles per hour. Officer Roberts's radar unit clocked the car at a speed of 35 miles per hour. There was medium to heavy traffic on the highway. Officer Roberts, who was headed south, made a U-turn, and followed Swanson's car out of the construction area, pulling it over in a restaurant parking lot. The license plate was clearly visible to Officer Roberts, who could see that the plate displayed a current license renewal sticker. Officer Roberts called in the license plate number on the car. Officer Roberts then left his patrol vehicle and approached the driver's side of the car. He ordered Swanson to produce his driver's license, registration, and proof of insurance. Swanson commented that he had just been stopped a

few minutes earlier, but nevertheless complied. Officer Roberts returned to his patrol vehicle, where he ran an inquiry on Swanson's driver's license and began writing out a warning citation.

{8} ADPS Officer Penny Yost, who had also heard Deputy House's radio transmission, spotted Officer Roberts as he pursued Swanson's car through the construction zone. Officer Yost, who was headed south, continued south until she found a place to turn around. Officer Yost was aware that Officer Roberts operated with a narcotics dog and that he could not place an arrestee in the back of his own vehicle due to the presence of the dog. Officer Yost turned her patrol vehicle around and headed north to assist Officer Roberts. By the time she caught up to the two vehicles, Officer Roberts had already stopped Swanson's car and had returned to his vehicle, where he was running the check on Swanson's license and writing out the citation.[1]

{9} At the time of the stop it was hot, humid, and raining off and on. Swanson was drumming his fingers on the top of the car, glancing back at Officer Roberts, and watching Officer Roberts in the rearview mirrors. Defendant rolled the passenger-side window up and down several times, conversed with Swanson, and looked back at Officer Roberts. Defendant's and Swanson's behavior, coupled with Deputy House's warning, made Officer Roberts nervous.

{10} Officer Roberts waited for the return on the license inquiry. He completed the warning citation and returned to the driver's window of Swanson's car with the citation in his hand. Officer Yost had positioned herself on the passenger side of the car. Instead of handing the citation to Swanson for his signature, Officer Roberts ordered Defendant and Swanson to get out of the car. Defendant and Swanson became "belligerent," at first refusing to get out. They asked Officer Roberts why they had to get out of their car. Officer Roberts responded that it was a matter of officer safety and that he wanted to make sure that they were not concealing weapons on their person. Defendant and Swanson reluctantly stepped out of the car.

{11} When Officer Roberts requested permission to pat down Swanson, Swanson protested that Officer Roberts had no right to pat him down. When Officer Roberts ordered Swanson to move to the back of the car, Swanson took a step backward, away from Officer Roberts. Officer Roberts put his hand on Swanson's right shoulder and directed Swanson to the rear of the car. Officer Roberts ordered Swanson to lace his fingers behind his head. As Officer Roberts began the pat down, he could tell that Swanson's body was rigid. As Officer Roberts's hands worked toward the front waistband of Swanson's pants, he encountered an object. Swanson attempted to pull away. Officer Roberts forced Swanson face down onto the trunk of the car. Swanson exclaimed, "It's only a little dope!" Officer Yost observed a bundle wrapped in duct tape tucked in the waistband of Swanson's pants. Officer Yost retrieved the bundle. Officer Roberts handcuffed Swanson and placed him in Officer Yost's car, he gave Swanson his *Miranda* warnings.

{12} Defendant's turn came next. Officer Yost read Defendant his *Miranda* warnings. Officer Yost asked Defendant if he would consent to a pat down. Defendant agreed. Officer Yost then asked Defendant if he had marijuana on him. Defendant answered yes, explaining that it was in the front of his pants. Officer Yost conducted a cursory pat down and Officer Roberts reached down into the front of Defendant's pants and retrieved a package. Defendant was placed in the back of Officer Yost's vehicle.

{13} A search of the car failed to reveal other drugs or any weapons. The packages seized by Officers Roberts and Yost were tested and found to contain marijuana. Defendant and Swanson were indicted on charges of possession of marijuana with intent to distribute and conspiracy to distribute marijuana.

---

1. In his testimony before the grand jury, Officer Roberts testified that Officer Yost appeared on her own initiative. At the hearing on the motion to suppress, Officer Roberts testified that he became nervous as he was writing out the citation and called for backup over the radio, and that Officer Yost appeared in response to his call for backup.

{14} Swanson filed a motion to suppress the marijuana seized during the stop. Swanson argued that the stop was pretextual and that the pat down was not supported by a reasonable suspicion that Swanson or Defendant was armed and presently dangerous. Swanson, argued that "[u]nsupported intuition and inarticulate hunches are not sufficient" and that

> Officer Roberts had no facts at his disposal that would have objectively lead a reasonable man to believe the Defendant was armed and presently dangerous at the time of the search. It is common for people to wonder what the police officer is doing behind them when stopped by the police, regardless of how minor the violation. Such apparently frustrated behavior does not constitute reasonable grounds to believe that a suspect is armed and dangerous.

Defendant joined in Swanson's motion. After an evidentiary hearing, during which the facts recounted above were established through the testimony of Deputy House and Officers Roberts and Yost, the district court denied the motion to suppress. The district court found that the car had been speeding when stopped by Officer Roberts. The district court further found that

> During the stop, Officer Roberts observed that Defendants were nervous, e.g. Defendant Swanson was tapping his fingers on the roof of his vehicle, Defendant Vandenberg was rolling his window up and down, both were conversing within the vehicle and glancing backwards at Officer Roberts. This gave Officer Roberts reasonable suspicion to believe that these Defendants may have weapons on their persons.

The district court's remarks at the suppression hearing indicate that the court relied upon *State v. Chapman,* 1999–NMCA–106, 127 N.M. 721, 986 P.2d 1122, as support for its ruling.

{15} Following the denial of their motion to suppress, Defendant and Swanson entered conditional no contest pleas, expressly reserving the right to appeal from the denial of their motion to suppress.

## DISCUSSION

{16} On appeal from an order granting or denying a motion to suppress, we accept the view of the evidence establishing the historical facts in the light most favorable to the prevailing party; we review the application of the law to the historical facts so established under a de novo standard. *State v. Jones,* 2002–NMCA–019, ¶ 9, 131 N.M. 586, 40 P.3d 1030. "[D]efendants have the burden to raise an issue as to their illegal search and seizure claims. Once they have done so, the burden shifts to the state to justify the warrantless search [or seizure]." *State v. Baldonado,* 115 N.M. 106, 110, 847 P.2d 751, 755 (Ct.App.1992) (citation omitted).

{17} A police officer may stop a vehicle if he has an objectively reasonable suspicion that the motorist has violated a traffic law. *State v. Vargas,* 120 N.M. 416, 418–19, 902 P.2d 571, 573–74 (Ct.App.1995). Deputy House testified that he stopped Swanson's car because he did not see a license plate displayed on the rear of the car. NMSA 1978, § 66–3–18(A) (1978) provides as follows:

> The registration plate shall be attached to the rear of the vehicle for which it is issued . . . . The plate shall be securely fastened at all times in a fixed horizontal position at a height of not less than twelve inches from the ground, measuring from the bottom of the plate. It shall be in a place and position so as to be clearly visible, and it shall be maintained free from foreign material and in a condition to be clearly legible.

NMSA 1978, § 66–8–7(A) (1978) declares that "[i]t is a misdemeanor for any person to violate any provision of the Motor Vehicle Code . . . unless the violation is declared a felony." Deputy House testified that it was not until he had already stopped the car that he recognized that the license was displayed on the rear of the car.

{18} The trial court, as the sole judge of credibility, was entitled to believe Deputy House and to find that Deputy House honestly thought Swanson's car did not display a license plate. However, because the standard for reasonable suspicion is objective,

Deputy House's subjective belief is irrelevant. We agree with Defendant that to establish reasonable suspicion an officer cannot simply claim that he *thought* that he had observed a particular violation, where even a modest effort would have shown his subjective perception to have been mistaken. The initial stop occurred in daylight on a summer afternoon. It is undisputed that the license plate was displayed in the location on the rear of the automobile provided by the manufacturer. There was no evidence that space provided for the license plate on a 1975 Monte Carlo fails to conform to the requirements of Section 66–3–18(A). Officer Roberts had absolutely no difficulty in observing the license plate. As a law enforcement officer, Deputy House should have been aware that Section 66–3–18(A) authorizes license plates to be located in a range of locations on the rear of an automobile. We conclude that, viewed in the light most favorable to the State, the evidence elicited at the hearing on the motion to suppress would not support a finding that Deputy House's failure to notice the license plate was objectively reasonable. Thus, the observations of Defendant's and Swanson's demeanor and behavior reported to Officer Roberts by Deputy House constitute information obtained through the exploitation of an unconstitutional seizure and therefore cannot be used by the State to establish reasonable suspicion on the part of Officer Roberts. *See State v. Ingram,* 1998–NMCA–177, ¶¶ 6–7, 126 N.M. 426, 970 P.2d 1151 (discussing application of exclusionary rule to fruits of an unlawful search or seizure); *see also* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4(i) at 233 (3d ed.1996) (noting that federal standards for

finding of reasonable suspicion based on information obtained from another officer require that officer providing information must himself have possessed reasonable suspicion justifying a stop).

{19} As to the second stop, there is no dispute that Officer Roberts observed Swanson's car traveling above the posted speed limit within a construction zone. NMSA 1978, § 66–7–301(A)(4) (1978) provides that "[n]o person shall drive a vehicle on a highway at a speed greater than ... the posted speed limit in construction zones." Officer Roberts clearly possessed a reasonable suspicion that Swanson had violated a traffic law, which, under *Vargas,* was a constitutionally sufficient basis for stopping the car.[2] 120 N.M. at 418–19, 902 P.2d at 573–74.

{20} Citing to *Chapman,* the State argues that the testimony of Officers Roberts and Yost provided specific articulable facts giving rise to a reasonable suspicion that Defendant and Swanson might be armed and dangerous. The State relies on the following circumstances observed by Officers Roberts and Yost: (1) Defendant and Swanson were substantially more nervous than people in a typical traffic stop; (2) Defendant and Swanson tried to view Officer Roberts in their rearview mirror; (3) Defendant and Swanson moved around more than usual; and, (4) Swanson became extremely upset and resisted efforts to pat him down.

{21} In *Chapman,* we held that a motorist's display of extreme, incapacitating shaking in response to questioning about the presence of drugs or drug paraphernalia coupled with aggressive and hostile behavior supported a reasonable suspicion that the

---

**2.** We have not been called upon to decide whether Officer Roberts's observation of a speeding violation should or should not be considered the fruit of Deputy House's earlier unlawful stop. *See State v. Wagoner,* 2001–NMCA–014, ¶¶ 25–26, 130 N.M. 274, 24 P.3d 306 (discussing *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)); *see also* 5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(a) at 238 (3d ed. 1996) ("The hard question, then, is whether, after illegally obtained evidence points the finger of suspicion at a certain person and the police thereafter undertake an investigation of that individual, the entire investigation is tainted by the prior illegality of whether, on the other hand, the facts uncovered in the later investigation may be said to have come from an 'independent source.' "). This issue has not been adequately preserved or developed, and in view of our conclusion that the evidence seized by Officers Roberts and Yost must be suppressed on other grounds, we are not inclined to address it on our own initiative. We mention this point to make it clear that by proceeding to address the lawfulness of the pat down, we have not implicitly decided this issue in favor of the State.

motorist posed a threat to the safety of the officer conducting a valid traffic stop. We therefore upheld the trial court's refusal to suppress evidence seized by the officer in the course of a weapons pat down. We take this opportunity to make clear that *Chapman* did not adopt a rule equating simple nervousness with reasonable suspicion. *See id.* ¶¶ 15–16.

{22} A review of cases from other jurisdictions indicates that, although a motorist's nervousness during a traffic stop may be a relevant factor in determining reasonable suspicion, nervousness of itself generally will not support a reasonable suspicion either that the motorist is engaged in criminal activity or that he is armed and dangerous. *E.g., Caldwell v. State,* 780 A.2d 1037, 1050 (Del.2001); *Ferris v. State,* 355 Md. 356, 735 A.2d 491, 508–09 (1999); *State v. DeMarco,* 263 Kan. 727, 952 P.2d 1276, 1283–84 (1998); *State v. Washington,* 623 So.2d 392, 398–99 (Ala.Crim.App.1993). The Tenth Circuit Court of Appeals has held that "[n]ervousness alone cannot support reasonable suspicion of criminal activity. This is because it is common for most people 'to exhibit signs of nervousness when confronted by a law enforcement officer' whether or not the person is currently engaged in criminal activity." *United States v. Salzano,* 158 F.3d 1107, 1113 (10th Cir.1998) (quoting *United States v. Wood,* 106 F.3d 942, 948 (10th Cir.1997) (internal citation omitted)). There appears to be uniform agreement among the federal Courts of Appeals that nervousness, by itself, generally will not support a reasonable suspicion of criminal activity, much less that a subject is armed and dangerous. *United States v. Chavez–Valenzuela,* 268 F.3d 719, 726 (9th Cir.2001) (collecting cases).

{23} Although Fourth Amendment issues most frequently arise in the context of rulings on motions to suppress evidence in a given defendant's case, we must not lose sight of the effect our holding may have in defining the rights of law-abiding citizens to go about their daily activities without unreasonable interference by law enforcement officials. *See Karnes v. Skrutski,* 62 F.3d 485 (3d Cir.1995) (reversing grant of summary judgment in favor of defendant law enforcement officers on issue of qualified immunity;

remanding case for trial on issue of whether detention of plaintiff-motorist was supported by reasonable suspicion). A *Terry* stop and frisk is "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio,* 392 U.S. 1, 17, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). To insure that police are not given unlimited discretion to stop and search citizens, we must be satisfied that any criteria relied upon by officers to establish reasonable suspicion are sufficiently discriminating " 'to eliminate [from suspicion of wrongdoing] a substantial portion of innocent travelers.' " *Ferris,* 735 A.2d at 507 (quoting *Karnes v. Skrutski,* 62 F.3d 485, 493 (3d Cir.1995)). In other words, we must decide whether there is a constitutionally acceptable fit between the circumstances observed by Officers Roberts and Yost and the inference drawn by these officers that Defendant or Swanson was presently armed and dangerous. *Compare Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (observing that "[w]hile 'reasonable suspicion' ... requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification") *with Wardlow,* 528 U.S. at 133, n. 8, 120 S.Ct. 673 (Stevens, J., concurring in part, dissenting in part) (observing that ratio of one arrest for every five stops entails "significant cost in infringement on liberty [due to] virtually random stops").

{24} We would welcome any empirical evidence that could shed light on the question of how the behaviors observed by Officers Roberts and Yost relate to the actual danger presented to an officer involved in a traffic stop. *See* Tracey L. Meares & Bernard E. Harcourt, *Forward: Transparent Adjudication and Social Science Research in Constitutional Criminal Procedure,* 90 J.Crim. L. & Criminology 733 (2000) (calling for greater use of social science and empirical data in constitutional criminal procedure decisionmaking). The most recent study of *Terry* stops of which we are aware was not cited by either party. Civil Rights Bureau, Office of the Attorney General of the State of New York, *The New York City Police Depart-*

ment's "Stop & Frisk" Practice: A Report from the Office of the Attorney General (December 1, 1999) (summarizing quantitative analysis of approximately 175,000 stops by New York City police officers). The trial court was not provided with any evidence of Officer Roberts's own overall success rate in identifying those traffic offenders who were armed at the time of a stop and who subsequently were determined to have been involved in a crime suggesting a likelihood that the subject would have used deadly force to avoid detection or capture. The only evidence we have of Officer Roberts's ability to distinguish dangerous from non-dangerous traffic offenders is provided by the facts of the present case in which Officer Roberts *incorrectly* identified Defendant and Swanson as armed and dangerous. Thus, while we recognize that in appropriate cases, evidence of an officer's prior experience may be relevant, the record in the case before us does not provide us with any basis for inferring that Officer Roberts's experiences as a police officer have resulted in a heightened ability to distinguish dangerous from non-dangerous traffic offenders. *People v. F.J.*, 315 Ill.App.3d 1053, 248 Ill.Dec. 716, 734 N.E.2d 1007, 1011 (2000) (observing that State bears burden of placing officer's experience in context that allows inference that officer's "trained eye" perceived special significance in otherwise innocent behavior).

{25} Defendant and Swanson's behavior— watching Officer Roberts in the rearview mirror, drumming fingers on the roof of the car, speaking to each other, rolling the windows of the car up and down, glancing back at Officer Roberts, and general fidgeting— during the second stop came nowhere near the panicked and aggressive behavior observed by the officer in *Chapman*. We hold as a matter of law that, at the point in time that Officer Roberts ordered Defendant and

Swanson out of their car, Officer Roberts lacked a reasonable suspicion that they were armed and prepared to use deadly force against Officers Roberts and Yost.[3]

{26} The State argues that the facts that Swanson became extremely upset when he was ordered from the car and that he resisted the pat down supported a reasonable suspicion that Defendant and Swanson were armed and dangerous. There are two flaws in the State's argument. First, as we have explained above, Officer Roberts lacked a reasonable suspicion that Defendant or Swanson were armed and dangerous, and therefore had no constitutionally sufficient grounds for a pat down. Second, the State fails to recognize that by the time Officer Roberts ordered Defendant and Swanson from their car, the purposes of the traffic stop had been fulfilled.

In sum, the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot.

*Ferris*, 735 A.2d at 499 (internal citation omitted). At the point in time that Officer Roberts ordered Defendant and Swanson from their vehicle, the original traffic stop no longer justified detaining Defendant and Swanson for any purpose other than obtain-

**3.** The dissent argues that our analysis is inconsistent with the totality-of-the-circumstances methodology employed by the United States Supreme Court in cases arising under the Fourth Amendment. *E.g. United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). We do not agree that our analysis or the result we have reached is inconsistent with the United States Supreme Court's current Fourth Amendment methodology. However, if we have overestimat-

ed the vitality of the Fourth Amendment, we are confident that our analysis and the result we reach is mandated by Article II, Section 10 of the New Mexico Constitution. Under the interstitial analysis adopted in *State v. Gomez*, 1997–NMSC–006, 122 N.M. 777, 932 P.2d 1, the New Mexico Constitution provides an adequate and independent ground for suppressing the evidence seized by Officers Roberts and Yost.

362

ing Swanson's signature on the citation. The State is impermissibly attempting to use Swanson's response to the unconstitutional seizure and search of his person to justify the seizure and search. "Reasonable suspicion must exist at the inception of the seizure. The officer cannot rely on facts which arise as a result of the encounter." *In re Jason L.*, 2000–NMSC–018, ¶ 20, 129 N.M. 119, 2 P.3d 856 (internal citation omitted).

{27} The State asserts that the search of Defendant was consensual. However, this alternate argument for affirmance erroneously assumes that the continued detention of Defendant and Swanson and the pat down of Swanson were lawful. Because the record contains no evidence of a "sufficient causal break," we conclude that Defendant's consent was tainted by the immediately preceding unconstitutional search of Swanson and that the taint was not purged. *State v. Cardenas–Alvarez*, 2001–NMSC–017, ¶ 22, 130 N.M. 386, 25 P.3d 225.

## CONCLUSION

{28} The order denying Defendant's motion to suppress is vacated and this case is remanded to the district court for entry of an order granting Defendant's motion to suppress.

{29} **IT IS SO ORDERED.**

I CONCUR: CELIA FOY CASTILLO, Judge.

LYNN PICKARD, Judge (dissenting).

PICKARD, Judge (dissenting).

{30} The majority opinion holds that the factors articulated by Officer Roberts for believing that a pat-down was required for his safety amount to simple nervousness, which is insufficient justification for a pat-down. Although there is much in the majority opinion with which I agree, I must respectfully dissent from this ultimate conclusion. I believe that the majority opinion is inconsistent with the United States Supreme Court's most recent case on reasonable suspicion, *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); that *Arvizu* casts doubt on the continuing vitality

of the cases cited in paragraphs 22 through 24 of the majority opinion; and that while the majority opinion may be consistent with the method of analysis used in *State v. Cardenas–Alvarez*, 2001–NMSC–017, 130 N.M. 386, 25 P.3d 225, I would limit that analysis to the situation where officers are merely investigating crime or searching for evidence, and use the *Arvizu* analysis when officers are acting to protect themselves from harm. Otherwise, I fear, as the trial court said, that we "would leave officers in a position of subjecting themselves to unacceptable risks in the context of traffic stops."

{31} In *Arvizu*, the Supreme Court re-emphasized its commitment to the "abstract" and sometimes "elusive" nature of the concept of reasonable suspicion, refusing to approve of the Ninth Circuit's attempt to carve out analytical rules. *See id.* at 751. The Court rejected what it termed a "divide-and-conquer" analysis, pursuant to which each factor articulated by the officers would be viewed with an eye toward whether it was consistent with innocent behavior. *Id.* Instead, the Court re-affirmed the "totality of the circumstances" test for reasonable suspicion, which required, under the facts of that particular case, the appellate court to defer to the trial court's deference to the police officer's experience. It also required rejection of the defendant's contention that everything he did was consistent with a family in a minivan on a holiday outing. *Id.* at 752–53. When viewed in the light of *Arvizu*, the majority's reliance on cases that downplay nervousness, because nervousness during a traffic stop is a common, innocent reaction, appears incorrect as a matter of Fourth Amendment Law.

{32} I must acknowledge that our Supreme Court used the identical "divide-and-conquer" analysis in *Cardenas–Alvarez*, 2001–NMSC–017, ¶ 21, 130 N.M. 386, 25 P.3d 225. There, the Court was unable to find a reasonable suspicion under the totality-of-the-circumstances test it said it used. *Id.* The Court so concluded even though the officer, who was very experienced in the vehicle-towing business, articulated several reasons why the defendant's explanation of his trip to tow a vehicle was implausible, and

thereby would have provided a reasonable suspicion that criminal activity was afoot under the *Arvizu* framework. *Cardenas–Alvarez*, 2001–NMSC–017, ¶¶ 2–3, 130 N.M. 386, 25 P.3d 225.

{33} If all that were at issue in this case was whether Officers Roberts and Yost had reasonable suspicion to further detain Defendant or conduct further investigation, I would agree with the majority because *Cardenas–Alvarez* squarely supports a holding that, in the balance between individual rights and ferreting out crime, individual rights prevail under these facts. But more is at stake in this case. The central concern in this case is the safety of the officers. In none of the cases on which the majority relies was officer safety the predominant concern, or even any concern at all from the testimony of the officers. The cases all involved reasonable suspicion to investigate violations of the law. *See, e.g., Caldwell v. State*, 780 A.2d 1037, 1051 (Del.2001) (pointing out that "the officer did not indicate that he had any reason to fear for his safety").

{34} In contrast, in the present case, as in *State v. Chapman*, 1999–NMCA–106, ¶ 16, 127 N.M. 721, 986 P.2d 1122, officer safety was the only justification for the pat-down. And as I read *Chapman*, it is not the degree of nervousness that allows the officer to pat a defendant down, but instead it is the articulation by the officer of specific reasons why the nervousness displayed by the defendant caused the officer to reasonably believe that his or her safety would be compromised. *See id.* ¶¶ 15–16 (stating that officer must state "specific, articulable facts" or "identifiable, articulable facts," and not "hunches" or "conclusive characterizations," which cause a "reasonable" belief that a defendant may be armed and dangerous). In fact, several of the cases relied on by the majority had the sort of extreme nervousness present in *Chapman*, and the courts still held the nervousness to be insufficient to warrant further investigation. *See, e.g., United States v. Chavez–Valenzuela*, 268 F.3d 719, 722 (9th Cir.2001) (describing defendant's nervousness and stating that his "hand was shaking severely"); *Caldwell*, 780 A.2d at 1043 (char-

acterizing the defendant as "extremely nervous").

{35} The court below relied on two factors in denying the motion to suppress: (1) that the stop was a valid stop for speeding and (2) that the officer explained exactly why Defendant's and Swanson's actions justified a reasonable fear for safety. The majority rightly does not question the first factor. Although the trial judge recognized that the facts surrounding the two stops could be viewed as "fishy," he properly considered only the testimony concerning Officer Roberts' articulated reason for stopping the car. Roberts explained that he stopped the car because it was speeding in a construction zone in which Roberts had stopped over 100 people for speeding. The construction zone was a dangerous area, and Roberts himself had investigated 20 accidents in it. *See State v. Pallor*, 1996–NMCA–083, ¶¶ 12–15, 122 N.M. 232, 923 P.2d 599 (indicating that a court ignores any subjective reasons for stopping an individual as long as there is an objective, reasonable basis to do so).

{36} As to the second factor, the trial court specifically found that Officer Roberts was telling the truth and was subjectively concerned for his safety, and that the objective facts made it reasonable for him to feel that way. The reasons offered by the officers for asking the occupants of the vehicle to get out and be patted down before handing them the ticket were not limited to simple nervousness, unarticulated hunches, or conclusive characterizations. Officer Roberts is an experienced officer; he stops 50 people a night. The people he stops for speeding do not normally look around; they do not normally fidget or move around. Vandenberg was rolling the car window up and down, and Swanson was drumming his fingers on the roof of the car. Both were keeping an eye on the officer, either in the rear-view or side mirror or by turning around. Roberts testified that what Vandenberg and Swanson were doing made him nervous for his safety, so nervous that he did not want to hand the citation to Swanson until Yost had arrived as back up. He explained that the type of nervous behavior he saw was not only greater than normal, but was also an indicator to

**364**

him that Swanson was trying to expel nervous energy that was being built up in his body, nervous energy that Roberts thought was a precursor to the "flight or fight" syndrome that he learned about at the police academy. According to Roberts, people this nervous were unpredictable, and Roberts wanted to make sure that the unpredicability would not ultimately result in harm to him.

{37} In *State v. Lovato*, 112 N.M. 517, 522, 817 P.2d 251, 256 (Ct.App.1991), we relied on *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), in stating that, "Even in routine traffic stops, police may adopt precautionary measures addressed to reasonable fears ... [due to] the inordinate risks police take when they approach vehicles with persons seated in them ...." Interestingly, *Mimms* relied on statistics that 30% of police shootings occurred when a police officer approaches a suspect seated in an automobile and that a significant percentage of murders of police officers occurs when officers are making traffic stops. *Mimms*, 434 U.S. at 110, 98 S.Ct. 330. Although *Mimms* involved approving the practice of having occupants get out of vehicles even without any individualized suspicion, and retaining the requirement of articulable suspicion to engage in a more intrusive patdown, I do not believe that we should require more of our officers than the articulation of factors both (1) believed by the trial court and (2) specific enough in the context of a given case to reasonably cause the officers to be concerned for their safety. Because we have those here and because I cannot meaningfully distinguish *Chapman*, I would affirm.