This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.                                  **NO. 29,606**

**ANTHONY LIELLO,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Lisa C. Schultz, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Victoria Wilson, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**KENNEDY, Judge.**

    Defendant appeals from his convictions for driving under the influence of

drugs, possession of marijuana, and possession of drug paraphernalia, which were entered pursuant to his conditional guilty plea. In the plea agreement, Defendant reserved the right to appeal the denial of his motion to suppress. On appeal, Defendant argues that his high degree of nervousness at a DWI checkpoint did not provide the officer with reasonable suspicion of criminal activity to justify sending him to the secondary inspection area. We agree with Defendant and reverse.

**DISCUSSION**

Suppression rulings involve mixed questions of fact and law. *See State v. Vandenberg*, 2003-NMSC-030, ¶ 17, 134 N.M. 566, 81 P.3d 19. Factual questions we review for substantial evidence and then view the facts in the light most favorable to the prevailing party. *See id.* ¶ 18. Legal questions we review de novo, including the constitutional reasonableness of the officers' actions. *See id.* ¶ 19.

A pivotal legal question in this case is whether the law requires an officer to articulate reasonable suspicion of criminal activity to justify sending a motorist to a secondary inspection area at a DWI checkpoint or whether a lesser suspicion is permitted. Defendant argues that his prolonged detention at the sobriety checkpoint violated both his federal and state constitutional rights. The parties do not dispute on appeal that the officer must have constitutionally reasonable suspicion. In *State v. Cardenas-Alvarez*, the New Mexico Supreme Court observed that under federal law

2

checkpoint stops "may be conducted at primary or secondary inspection areas without suspicious circumstances." 2001-NMSC-017, ¶ 9, 130 N.M. 386, 25 P.3d 225. The New Mexico Supreme Court held that the New Mexico Constitution, however, provides greater protection for secondary detentions at routine checkpoint stops, requiring reasonable suspicion of criminal activity. *See id.* ¶ 16. Because Defendant asserted this greater protection in district court, we apply the state constitutional standard to the decision to send Defendant to the secondary inspection area. *See State v. Neal*, 2007-NMSC-043, ¶ 20, 142 N.M. 176, 164 P.3d 57 ("Following a valid stop and reasonably related investigation, further detention requires reasonable suspicion of criminal activity." (citation omitted)).

"[R]easonable suspicion is measured by an objective standard, in which the court examines the totality of the surrounding circumstances, to determine whether the officer acted reasonably in expanding the scope of inquiry." *Id.* ¶ 21 (internal quotation marks and citation omitted). "A reasonable suspicion is a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken, the law." *Id.* (internal quotation marks and citation omitted). "In the absence of specific and particularized incriminating information about the criminal activity that defendant is or is about to engage in, generalized suspicions . . . [are] insufficient to create reasonable suspicion for an investigatory

detention." *Id.* ¶ 25 (internal quotation marks and citation omitted).

At the suppression hearing, Captain Richard Williams testified about the encounter he had with Defendant while on duty at a DWI checkpoint. Captain Williams remembered when Defendant pulled up to the checkpoint, his attention was immediately caught by Defendant's extreme nervousness and shaky hands. The captain testified that Defendant's nervousness was extreme and the captain was concerned about Defendant's ability to drive while shaking that much. Captain Williams observed two unopened cans of beer next to the driver's seat and asked Defendant if he had consumed any alcohol that day. Defendant responded, "not yet." The captain testified that he did not know why Defendant was so nervous and that he did not suspect drinking; he was "just concerned" based on the brief moment he had to evaluate Defendant. Captain Williams emphasized that he would not be able to make a determination based on a minute-long conversation. He further testified that most officers would have completed the investigation at the primary inspection area, but that as the captain, he asked one of his officers to take over and conduct his own investigation at the secondary inspection area. The captain stated that his uncertainty about the reason for Defendant's nervousness was why he had someone else conduct the investigation and why he directed Defendant to the secondary inspection area.

Captain Williams stated his understanding that in order to send motorists for a

4

secondary inspection, he was looking for impairment. When asked how nervousness indicates impairment, the captain stated that in his experience with methamphetamine users, they become highly nervous, agitated, and paranoid. When asked what other facts the officer could point to, he responded that he used his experience to arrive at a reasonable suspicion that Defendant was "tweaking."

In its order denying Defendant's motion to suppress, the district court expressly refused to consider any testimony the captain gave regarding his suspicions that Defendant was "tweaking" from methamphetamine use. Because we do not consider evidence for the first time on appeal and do not make implicit or explicit credibility determinations, we too refuse to consider this testimony as part of the totality of the circumstances that could lead to reasonable suspicion of criminal activity. *See State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (recognizing that we defer to the district court as fact finder to resolve any conflict in the testimony of the witnesses and to determine where weight and credibility lay). The district court concluded that Captain Williams had reasonable suspicion of impairment to direct Defendant to the secondary inspection, based on his experience of seventeen years and Defendant's extreme nervousness and shaky hands. The district court explicitly rejected the evidence linking impairment to anything other than Defendant's nervousness and shaky hands. Therefore, despite the State's reliance on the fact in

5

their brief, we consider only whether the captain's testimony established reasonable suspicion of impairment based on Defendant's nervousness and shaky hands.

Our case law dealing with a defendant's nervousness and physical signs of nervousness acknowledges that, combined with other suspicious circumstances, an officer may develop a reasonable suspicion of criminal activity, or, with sufficiently specific testimony, an officer could develop a reasonable suspicion that the defendant is armed and dangerous. *State v. Chapman*, 1999-NMCA-106, ¶¶ 2, 16-18, 127 N.M. 721, 986 P.2d 1122; *see, e.g.*, *State v. Guzman*, 118 N.M. 113, 116, 879 P.2d 114, 115 (Ct. App. 1994); *Vandenberg*, 2003-NMSC-030, ¶¶ 4-6, 8-10, 28-33. These and other cases have firmly established that a generalized report of nervousness, alone, is not enough for an officer to develop a reasonable suspicion of criminal activity or to justify a protective frisk. *See State v. Gutierrez*, 2008-NMCA-015, ¶ 18, 143 N.M. 522, 177 P.3d 1096; *Neal*, 2007-NMSC-043, ¶ 29; *Vandenberg*, 2003-NMSC-030, ¶ 31.

We see material distinctions between the case law involving nervousness that led to reasonable suspicion and the case at hand. In *Guzman*, a border checkpoint case, the officer smelled an overwhelming odor of air freshener from five or six feet away from the defendant's vehicle, which indicated to the experienced officer that the defendant was attempting to mask the odor of unlawful drugs. *See Guzman*, 118 N.M.

at 115-16, 879 P.2d at 114-15. Further, the officer observed that the defendant was nervous, his hands were shaking, and his eyes were darting around to avoid eye contact with the officer. *See id.* at 115, 879 P.2d at 114. Traffic at the checkpoint was backing up and he referred the defendant to the secondary inspection area. *See id.* This Court noted that "[n]ervousness during a routine checkpoint stop is more significant than nervousness when one's vehicle is singled out from traffic for a police stop." *Id.* at 116, 879 P.2d at 115. This Court held that the unusually strong odor of air freshener was a reliable factor in establishing reasonable suspicion, which combined with the defendant's unusual nervousness, justified the officer's decision to send the defendant to the secondary inspection area. *See id.*

In contrast, in the current case, the captain reported only that Defendant was extremely nervous and that his hands were shaking at the checkpoint stop combined with no other observations of suspicious conduct. Also, unlike the officer's testimony in *Guzman*, the captain in the current case did not express any concerns about the traffic backing up as a result of the length of his investigation at the primary checkpoint. In fact, the captain testified that traffic was not backed up and that he did not make any effort to maintain a flow of traffic through the roadblock because of safety concerns. Rather, he testified that he exercised his discretion as the captain to have another officer take over the investigation, and emphasized he had only a brief

7

moment to evaluate Defendant without offering any reason for this degree of brevity. The captain further stated that during the moment he interacted with Defendant, he did not "know what the issue was," and sent Defendant to another officer for a secondary inspection. The captain's testimony does not establish nervousness plus the other relevant factors of the type considered sufficient for a secondary investigation in *Guzman*.

Where an officer develops concerns that stem from a person's nervousness, New Mexico cases will not rely solely upon this information to expand the stop without further specifically articulated concerns of escalating circumstances that occur during the intial investigation stage of such stop. *See Vandenberg*, 2003-NMSC-030, ¶¶ 25-31; *Chapman*, 1999-NMCA-106, ¶¶ 2, 16-18; *cf. State v. Patterson*, 2006-NMCA-037, ¶ 29, 139 N.M. 322, 131 P.3d 1286 ("An officer's statement concerning a person's nervousness without an articulation of specific reasons of concern is insufficient to support a finding of individualized suspicion."). Our Courts have little regard for nervousness alone. In *Chapman*, we emphasized that "[i]nstead of just describing [the d]efendant as nervous, the deputy identified specific behaviors and changes in [the d]efendant's demeanor and attitude that explain why he believed that [the d]efendant might be armed and dangerous." *Chapman*, 1999-NMCA-106, ¶ 16.

In *Vandenberg*, the New Mexico Supreme Court reaffirmed our analysis in *Chapman*, and emphasized the need for officers to provide "other specific observations that made them anxious for their personal safety . . . [i]n addition to extreme nervousness." *See Vandenberg*, 2003-NMSC-030, ¶ 28. Like the officer in *Chapman*, the officer in *Vandenberg* testified about the unusual degree of the defendants' nervousness, and specifically described his feeling that the driver "was trying to expel nervous energy through his movement, stretching, drumming his fingers on the roof of the car." *Id.* ¶ 29. During the traffic stop, the driver and passenger were often speaking to each other; the passenger was fidgeting and looking around and in the glove compartment; and the driver was looking over his shoulder and in the rearview mirror, always making himself aware of the location of the officer. *See id.* ¶¶ 9, 29. The officer testified that based on his training and experience, people who are nervous to that degree "are often a threat to officer safety because they are unpredictable; [and their] nervousness indicated that [the defendants] may have been in 'fight or flight' mode, a concept he learned at the law enforcement academy." *Id.* ¶ 29. Based on the defendants' nervous and excessive movements, together with the information about their nervous and suspicious behavior that the officer received in a BOLO, and the officer's interpretation of their behavior, the officer was concerned for his safety and asked if they had any weapons and then required a protective frisk

9

for weapons. *See id.* ¶ 29. The officer went on to describe how each request he made "was met with increasing nervousness and symptoms of potentially unpredictable behavior, and sometimes with evasive or hostile behavior." *Id.* ¶ 30.

The Court held that the officer could have reasonably considered the defendants to be armed and dangerous to justify a protective frisk for weapons. *See id.* The Court cautioned that nervousness is but a mere factor in the calculus and that it is not the degree of nervousness that permits the intrusion, but the officer's articulation of specific reasons why the nervousness caused the officer to reasonably fear for his or her safety. *See id.* ¶ 31. The Court's majority opinion described *Vandenberg* as a "very close case," *id.* ¶ 33, and focused on the importance of officer safety, *see id.* ¶¶ 34-36, emphasizing that "[m]ore was at stake here than mere evidence." *Id.* ¶ 33.

The differences between the captain's testimony in the current case and the officers' testimony in *Chapman* and *Vandenberg* are substantial. The captain's testimony in this case does not reveal that he proceeded incrementally or engaged in much investigation into Defendant's nervousness at all. Instead, the captain indicated that he sent Defendant to the secondary inspection area so that another officer could investigate Defendant's nervousness. The captain's testimony that linked any degree of specificity regarding Defendant's nervousness to his suspicion of impairment was rejected by the district court. Therefore, we are left with the captain's generalized

10

concern about Defendant's nervousness and shaky hands and a bald legal conclusion that this conduct can be equated with reasonable suspicion of impairment. *See Vandenberg*, 2003-NMSC-030, ¶ 31 (warning that our case law has "not adopt[ed] a rule equating simple nervousness with reasonable suspicion"). Our Courts have not supported an inarticulate link between nervousness and impairment.

If the Supreme Court considered *Vandenberg* to be a very close case even with the officer's safety at issue, the BOLO information, the officer's detailed observations about the defendants' escalating conduct, and his testimony specifically identifying why their conduct reasonably caused him to believe the defendants were armed and dangerous, then the captain's generalized concern in the current case about Defendant's extreme nervousness falls well short of establishing reasonable suspicion of driving while impaired, and no such link or assumption was ever articulated in this case. Finding that the officer did not have a reasonable suspicion of criminal activity, Defendant's prolonged detention at the DWI checkpoint was without a lawful basis.

**CONCLUSION**

For the reasons set forth above, we reverse the district court's denial of Defendant's motion to suppress.

11

**IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Judge**

**WE CONCUR**:

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**TIMOTHY L. GARCIA, Judge**