2003-NMSC-030

81 P.3d 19

STATE of New Mexico, Plaintiff–
Petitioner,

v.

Shawn VANDENBERG, Defendant–
Respondent.

State of New Mexico, Plaintiff–
Petitioner,

v.

Jason Swanson, Defendant–Respondent.

No. 27509, 27510.

Supreme Court of New Mexico.

Oct. 1, 2003.

Patricia A. Madrid, Attorney General Arthur W. Pepin, Assistant Attorney General Santa Fe, for Petitioner.

John Bigelow, Chief Public Defender Vicki W. Zelle, Assistant Appellate Defender Santa Fe, for Respondents.

## OPINION

BOSSON, Justice.

{1} In this opinion, we trace the outer boundary of facts and circumstances sufficient to justify a protective frisk (pat down) for weapons during an ordinary traffic stop on the ground of officer safety pursuant to the Fourth Amendment to the United States Constitution. We hold that a weapons frisk was reasonable under the circumstances of this case. The Court of Appeals having decided differently, we now reverse and affirm the convictions below.

## BACKGROUND

{2} Jason Swanson and Shawn Vandenberg (Defendants) were indicted on charges of possession of marijuana with intent to distribute and conspiracy to distribute marijuana. Vandenberg filed a motion to suppress in which Swanson joined. After a hearing, the district court denied the motion,

concluding that the evidence was obtained through a valid, protective frisk for weapons. On appeal, the Court of Appeals reversed and ordered the evidence suppressed. *State v. Vandenberg*, 2002–NMCA–066, 132 N.M. 354, 48 P.3d 92; *State v. Swanson*, No. 21,-845, slip. op. (N.M.Ct.App. Apr. 17, 2002). The State petitioned this Court for a writ of certiorari which we granted. For purposes of this opinion, we consolidate the two cases.

### The First Stop

{3} On July 29, 1999, at approximately 5:00 p.m., Otero County Sheriff's Deputy House stopped a blue 1975 Monte Carlo on Highway 54 about two or three miles south of Alamogordo. Highway 54 is an area of heavy drug trafficking with a permanent Border Patrol station. Deputy House stopped the car because he thought it did not have a license plate. After stopping the car, the deputy noticed the vehicle did have a license plate located off to the side in a place where the manufacturer had designed it to be. Notwithstanding the presence of the license plate, Deputy House approached the driver, Swanson, and requested his driver's license, proof of insurance, and vehicle registration. He told Swanson that the license plate needed to be in a more visible location. Although Deputy House considered the inconspicuous placement of the license plate to be an offense under the traffic laws, he decided not to issue a citation.

{4} After Deputy House told the passengers they were free to go, Deputy Hill arrived on the scene. Deputy Hill is a canine officer who often provides assistance to Deputy House when he is on patrol. Before Swanson could leave, Deputy House asked for Swanson's permission to have Deputy Hill walk his dog around the car. Swanson asked if he had to consent to the canine sniff, and Deputy House replied that he did not. Swanson refused. According to Deputy House, Swanson and Vandenberg, the passenger, looked at each other, refused to make eye contact with Deputy House, and became very nervous when asked about the canine sniff.

{5} Deputy House allowed Defendants to continue on their way, yet his suspicions were aroused. In addition to the nervous behavior he observed, Deputy House had other concerns associated with the traffic stop. During the stop, another vehicle drove by and "honked and hollered" at Defendants. Swanson told Deputy House they had taken a friend to the El Paso airport and were on their way home. Deputy House assumed that the other car had also traveled to El Paso with them. Although Deputy House did not ask Swanson directly if this other car was traveling with them, he found it "unusual" that they had taken two vehicles to the airport. Their story seemed somehow inconsistent to Deputy House.

{6} Because Deputy House thought Defendants had acted in a suspicious and nervous manner, he issued a be-on-the-lookout (BOLO) to the Alamogordo city police. Officer Roberts responded to the call. Deputy House gave a description of the vehicle and the direction it was traveling. Deputy House told Officer Roberts about the nervousness he had observed and the alleged inconsistencies in their statements. The deputy also informed Officer Roberts that Defendants had refused the canine sniff.

### The Second Stop

{7} After Officer Roberts talked with Deputy House, he spotted a vehicle fitting the description in the BOLO. According to Officer Roberts, the car was traveling at an unsafe speed, 35 miles per hour in a 25 miles per hour construction zone. Officer Roberts stopped the vehicle for speeding. Officer Roberts also indicated that he had no problem seeing the license plate.

{8} Officer Roberts approached the car and asked Swanson for his driver's license, proof of insurance, and vehicle registration. Swanson was cooperative and provided the information. Officer Roberts returned to his police car to run a license inquiry and complete a speeding citation. Meanwhile, Officer Roberts observed Swanson tapping his fingers on the hood of his car, glancing back at him in both the driver's side view mirror and the rearview mirror, and glancing over his shoulder. He also observed Vandenberg rolling his window up and down several

times, looking back toward Officer Roberts, and conversing with Swanson.

{9} Officer Roberts is an experienced police officer. He makes approximately fifty traffic stops a night. Based on what he observed of Defendants, as well as on the BOLO and his radio conversation with Deputy House, Officer Roberts became nervous about his safety. He requested assistance, and within a few minutes Officer Yost arrived on the scene.[1] Officer Yost observed the passenger looking around, fidgeting, and looking in the glove compartment. She testified that the two men were talking to each other, and that Swanson was looking in his rearview mirror. Like Officer Roberts, Officer Yost testified that Defendants were acting in a manner more nervous than most people involved in a routine traffic stop.

{10} After Officer Yost arrived for backup, Officer Roberts approached the car again and told Swanson that his movements were making him nervous. Officer Roberts asked Swanson if he had any weapons inside the car, and Swanson responded in the negative. Officer Roberts then asked Swanson to get out of the car so he could frisk him for weapons. Swanson asked why he had to submit to a frisk, and Officer Roberts told him it was because he was making him (Roberts) nervous for his safety. After hesitating for a moment, Defendants both stepped out of the car.

{11} Officer Roberts requested that Swanson step to the rear of the car. Instead of complying, Swanson took a "very large" step away from Officer Roberts and again asked why Officer Roberts wanted to conduct a frisk. Swanson protested that he did not believe the officer had the authority to search him. Officer Roberts explained that he was not conducting a search, but simply a pat down for weapons. Swanson then became even more nervous, and Officer Roberts again requested that he move towards the rear of the vehicle. Swanson hesitated, and Officer Roberts touched Swanson's right shoulder to escort him to the rear of his vehicle. When Officer Roberts touched Swanson's shoulder, Swanson pulled away. At this time, Officer Roberts became even more concerned for his safety because of Swanson's body language and demeanor. Officer Roberts ordered Swanson to place his hands behind his head. Swanson hesitated, but eventually complied with Officer Roberts' directives, and Officer Roberts began his pat down.

{12} During the pat down, Swanson's body became very rigid. When Officer Roberts got near the waist area of Swanson's pants, Swanson pulled away. Officer Yost saw an object in the waistband of Mr. Swanson's pants. As Officer Roberts leaned Swanson over the trunk of the car, Officer Yost removed the object from Swanson's waistband. As Officer Yost struggled to remove the object from Swanson's waistband, Swanson told Officer Roberts that he did not have to be so rough with him "because it was only dope." Officer Roberts then placed Swanson in the back seat of Officer Yost's police car.

{13} Meanwhile, Vandenberg disclosed to Officer Yost that he also had an object concealed in his pants, which Officer Roberts removed. The officers called for additional backup and placed Vandenberg in the back of the other police car. After Swanson and Vandenberg were arrested, Officer Roberts searched the vehicle with his canine but did not discover any additional drugs or weapons. The objects seized by the officers were tested and found to contain marijuana.

## Procedural History

{14} Vandenberg filed a motion to suppress the marijuana, and Swanson joined the motion. In denying the motion to suppress, the district court stated:

[L]et me start with an observation and a ruling and the two are going to seem inconsistent. The observation is from a defendant's point of view or a defense coun-

---

1. There is some discrepancy as to whether Officer Roberts called for backup assistance or whether Officer Yost came to the scene on her own initiative. During the suppression hearing, Officer Roberts testified that he called for back-up. During the grand jury proceedings, Officer Roberts testified that Officer Yost had seen the traffic stop and came over to offer assistance. Officer Yost testified that she could not recall whether she received a call from Officer Roberts.

sel's point of view, and maybe from an ordinary skeptical point of view, this one looks fishy. [However,] the ruling is I'm going to deny the motion to suppress.

The district court acknowledged that "Deputy House's testimony about the license plate does seem odd, based on the later testimony that everything looked fine to the other two officers."

{15} Nevertheless, the court was "not convinced, just on that conflict, that Deputy House lied about the basis for his stop." The court was also "not convinced Officer Roberts lied about speeding as the basis for his stop." With regard to the frisk for weapons, the district court concluded that, "[u]nder these circumstances, ... Officer Roberts and Officer Yost have provided specific articulable facts which are the basis of a reasonable belief that the individuals may be armed and dangerous." Thus, the district court denied the motion to suppress, reasoning that the officers had a reasonable, articulable suspicion to justify a frisk for weapons, and that to hold otherwise "would leave officers in a position of subjecting themselves to unacceptable risks in the context of traffic stops." After the suppression hearing, Defendants entered conditional no-contest pleas and reserved their right to appeal the denial of their suppression motions.

{16} In a divided opinion, the Court of Appeals reversed the district court, holding that the evidence should have been suppressed because Defendants' rights under the Fourth Amendment to the United States Constitution had been violated. *Vandenberg*, 2002–NMCA–066, ¶ 1. The majority opinion concluded that Deputy House's failure to notice the license plate during the first stop was not objectively reasonable, and therefore, during the second stop Officer Roberts could not use the information obtained from Deputy House, and communicated in the BOLO, to establish reasonable suspicion for the weapons frisk. *Id.* ¶ 18. The majority opinion further concluded that Officer Roberts' observations of Defendants did not rise to the level of objectively reasonable suspicion, and therefore, were insufficient to justify a weapons frisk. *Id.* ¶ 25. The opinion did not consider Officer Roberts' professional

experience in assessing the accuracy of his observations because the record did not provide any specific, factual basis for inferring that Officer Roberts could distinguish between dangerous and non-dangerous traffic offenders. *Id.* ¶ 24. The majority opinion also determined that the purpose of the traffic stop had been completed by the time Officer Roberts ordered Swanson out of the car, and therefore, any frisk that followed was beyond the scope of the stop. *Id.* ¶ 26.

## DISCUSSION

### Standard of Review

{17} A motion to suppress evidence involves a mixed question of fact and law. *State v. Urioste*, 2002–NMSC–023, ¶ 6, 132 N.M. 592, 52 P.3d 964; *State v. Paul T.*, 1999–NMSC–037, ¶ 8, 128 N.M. 360, 993 P.2d 74. Thus, our review of this case involves two parts: the first is a factual question, which we review for substantial evidence; the second is a legal question, which we review de novo. *See State v. Jason L.*, 2000–NMSC–018, ¶ 19, 129 N.M. 119, 2 P.3d 856.

{18} With regard to the factual question, we review the facts in a light most favorable to the prevailing party, as long as the facts are supported by substantial evidence. *See id.* "As a reviewing court we do not sit as a trier of fact [because] the district court is in the best position to resolve questions of fact and to evaluate the credibility of witnesses." *Urioste*, 2002–NMSC–023, ¶ 6.

> [Q]uestions of "good faith belief" ... are questions of fact for the trial court to determine, and the findings of the trial court in these regards are entitled to be accorded the same weight and given the same consideration as is generally accorded a trial court's findings by appellate courts. Substantial evidence is the measure of proof, or the quality and quantity of the evidence, required to support the findings of the trial court.

*State v. Attaway*, 117 N.M. 141, 144, 870 P.2d 103, 106 (1994) (*quoting State v. Sanchez*, 88 N.M. 402, 403, 540 P.2d 1291, 1292 (1975)).

{19} However, deciding whether Officer Roberts' actions were objectively reasonable, extends beyond fact-finding. *See id.* at 145, 870 P.2d at 107. "It is the duty of

appellate courts to shape the parameters of police conduct by placing the constitutional requirement of reasonableness in factual context ...." *Id.* We conduct this review de novo along with our review of any inferences the district court may have drawn from its factual findings. *Id.; United States v. Arvizu,* 534 U.S. 266, 278, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). In performing this de novo review, we look at the totality of the circumstances. *See Attaway,* 117 N.M. at 145, 870 P.2d at 107; *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744.

### The Frisk for Weapons During the Second Stop

{20} We start our analysis with Officer Roberts' frisk for weapons during the second stop, because this event uncovered the marijuana. Before getting to the frisk, however, we briefly review the reasonableness of the second stop.

■■■■■ {21} Officer Roberts stopped Swanson for speeding in a construction zone. The district court believed Officer Roberts' stated reason for the stop based upon evidence that Swanson was exceeding the speed limit. Based on this evidence, the Court of Appeals agreed with the district court that Officer Roberts reasonably suspected that Swanson had violated a traffic law. Reasonable suspicion arises if the officer can point to " 'specific articulable facts ... that, when judged objectively, would lead a reasonable person to believe criminal activity occurred or was occurring.' " *State v. Taylor,* 1999–NMCA–022, ¶ 7, 126 N.M. 569, 973 P.2d 246 (quoting *State v. Pallor,* 1996–NMCA–083, ¶ 12, 122 N.M. 232, 923 P.2d 599). "Unsupported intuition and inarticulate hunches are not sufficient." *State v. Cobbs,* 103 N.M. 623, 626, 711 P.2d 900, 903 (Ct.App.1985). We agree with the analysis of both the district court and the Court of Appeals that Officer Roberts reasonably suspected that Swanson had violated a traffic law, and therefore, Officer Roberts was entitled to stop Swanson's car. We now turn to the weapons frisk that followed.

■■■■ {22} To justify a frisk for weapons, an officer must have a sufficient degree of articulable suspicion that the person being frisked is both armed *and* presently dangerous. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Any indication in previous cases that an officer need only suspect that a party is either armed *or* dangerous is expressly disavowed. *Cf. Cobbs,* 103 N.M. at 630, 711 P.2d at 907; *State v. Lovato,* 112 N.M. 517, 522, 817 P.2d 251, 256 (Ct.App.1991). We have previously made clear that when an officer is investigating inherently dangerous crimes, such as burglary or robbery, *Cobbs,* 103 N.M. at 630, 711 P.2d at 907, or a drive-by shooting, *Lovato,* 112 N.M. at 522, 817 P.2d at 256, the nature of the crimes may be a sufficient predicate, depending on the totality of the circumstances, to consider a suspect armed and dangerous and subject to a protective frisk for weapons.

■■■■ {23} To determine the reasonableness of a protective frisk for weapons, we must balance the threat posed to officer safety under the circumstances, against "the individual's right to personal security free from arbitrary interference by law officers." *Cobbs,* 103 N.M. at 627, 711 P.2d at 904 (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)) (internal quotation marks omitted); *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. A "frisk" is a unique type of limited search within the meaning of the Fourth Amendment. 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.5 (3d ed.1966). In *Terry,* the United States Supreme Court acknowledged a critical

> distinction in purpose, character, and extent between a search incident to an arrest and a limited search for weapons. The former, although justified in part by the acknowledged necessity to protect the arresting officer from assault with a concealed weapon, is also justified on other grounds, and can therefore involve a relatively extensive exploration of the person. A search for weapons in the absence of probable cause to arrest, however, must like any other search, be strictly circumscribed by the exigencies which justify its initiation.

*Id.*, 392 U.S. at 25–26, 88 S.Ct. 1868 (internal citation omitted). Although a weapons frisk must be strictly circumscribed by the exigencies that justify it, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. 1868; *see Paul T.*, 1999–NMSC–037, ¶¶ 17–18. The purpose of a frisk for weapons is to allow an officer to conduct an investigation without fear of violence. *State v. Ingram*, 1998–NMCA–177, ¶ 6, 126 N.M. 426, 970 P.2d 1151. In evaluating the reasonableness of an officer's conduct when confronted with exigent circumstances, "[t]he inquiry is an objective [one] ... into whether a reasonable, well-trained officer would have made the judgment this officer made. If reasonable people might differ ..., we defer to the officer's good judgment." *State v. Gomez*, 1997–NMSC–006, ¶ 40, 122 N.M. 777, 932 P.2d 1.

{24} Of course, the exigent circumstances justifying a protective frisk are not limited to investigations of violent crimes. Recently, in a very similar case our Court of Appeals upheld a protective frisk in the course of a routine traffic stop for a seat belt violation. *See State v. Chapman*, 1999–NMCA–106, ¶¶ 13–18, 127 N.M. 721, 986 P.2d 1122. Despite the absence of a violent crime, the Court concluded that the officer "reasonably believed that [the d]efendant might be armed and dangerous." *Id.* ¶ 18.

{25} In coming to this conclusion in *Chapman*, the Court of Appeals emphasized that the officer "provided more than [just] conclusive characterizations of [the d]efendant." *Id.* ¶ 16. "Instead of just describing [the d]efendant as nervous, the deputy identified specific behaviors and changes in [the d]efendant's demeanor and attitude that explain[ed] why he believed that [the d]efendant might be armed and dangerous." *Id.* Erratic behavior exhibited by the suspect, a "failure to make eye contact, shaking hands, and unusual level of nervousness[,] were sufficient to allow the deputy to ask [the d]efendant whether he had any weapons on him." *Id.* ¶ 17. After the officer asked about weapons, the suspect responded in a high-pitched

tone of voice and in an anxious and aggressive manner, and exhibited uncontrollable shaking. *Id.* ¶ 18. At that point, after becoming concerned for his safety, the officer subjected the driver to a frisk for weapons.

{26} Importantly, the officer in *Chapman* proceeded incrementally before frisking the suspect for weapons. *Id.* ¶¶ 17–18. The officer observed that the suspect's behavior deteriorated as he was questioned first in the car, and then outside the car, when he was specifically asked about weapons. *Id.; cf. City of Albuquerque v. Haywood*, 1998–NMCA–029, ¶¶ 15–16, 18, 124 N.M. 661, 954 P.2d 93 (Ct.App.1997) (granting motion to suppress because officer's questions about weapons and subsequent frisk for weapons, conducted during a routine traffic stop, were not justified by specific, exigent circumstances).

{27} We find *Chapman* particularly helpful in our analysis. In determining that Officer Roberts had a reasonable, articulable suspicion that Defendants might be armed and dangerous, the district court relied heavily on *Chapman*. On the other hand, the Court of Appeals majority opinion rejected *Chapman*, distinguishing it in the following manner:

> [Vandenberg] and Swanson's behavior—watching Officer Roberts in the rearview mirror, drumming fingers on the roof of the car, speaking to each other, rolling the windows of the car up and down, glancing back at Officer Roberts, and general fidgeting—during the second stop came nowhere near the panicked and aggressive behavior observed by the officer in *Chapman*.

*Vandenberg*, 2002–NMCA–066, ¶ 25. However, the dissenting opinion in *Vandenberg* was unable to "meaningfully distinguish *Chapman*," and we agree. *Id.*, 1999–NMCA–106, ¶ 37.

{28} In both *Chapman* and this case, the officers testified that the drivers were more nervous than most people who are stopped for a routine traffic offense. In addition to extreme nervousness, the officers in both cases identified other specific observations that made them anxious for their

personal safety. Although there are factual differences between *Chapman* and the present case, the principle underlying the two opinions is the same. The officers in both cases articulated specific reasons, including specific observations of the suspect's conduct placed in context, why they needed a protective pat down for their personal safety.

{29} Like the police officer in *Chapman,* Officer Roberts testified that most people during a traffic stop move around some, but not nearly to the degree of Swanson and Vandenberg. Officer Roberts felt Swanson was trying to expel nervous energy through his movement, stretching, drumming his fingers on the roof of the car, and being aware at all times of the location of the officer. Based on his training and experience, Officer Roberts testified that very nervous people are often a threat to officer safety because they are unpredictable; Defendants' nervousness indicated that they may have been in "fight or flight" mode, a concept he learned at the law enforcement academy. Defendants' excessive movement, coupled with the information he received in the BOLO, made Officer Roberts concerned enough for his safety, first to ask Defendants whether they had any weapons, and then to require a protective frisk for weapons.

{30} As in *Chapman,* the situation gradually escalated. Each request by Officer Roberts was met with increasing nervousness and symptoms of potentially unpredictable behavior, and sometimes with evasive or hostile behavior. *See id.,* 1999–NMCA–106, ¶ 18 (when the officer questioned the defendant in *Chapman* about whether he had any weapons, the defendant responded "in an anxious and aggressive manner"). Swanson questioned why he had to get out of the car and then only did so after hesitating. After Officer Roberts requested that Swanson move to the rear of the car, Swanson took a "very large" step backwards and questioned Officer Roberts' authority. When Officer Roberts explained that this was not a search, but simply a frisk for weapons, Swanson became increasingly nervous. When Officer

Roberts reached out and touched Swanson's right shoulder to escort him to the rear of the vehicle, Swanson physically pulled away. Considering the totality of the circumstances, including Officer Roberts own considerable law enforcement experience, we conclude that the officer reasonably could have considered Defendants to be armed and dangerous, justifying a protective frisk for weapons.[2]

{31} We caution that while nervousness may be a relevant factor in the calculus, we do not consider nervousness alone sufficient to justify a frisk for weapons. To reinforce the point, we expressly concur in that portion of the Court of Appeals' majority opinion that states: "We take this opportunity to make clear that *Chapman* did not adopt a rule equating simple nervousness with reasonable suspicion." *Vandenberg,* 2002–NMCA–066, ¶ 21. We also endorse the following statement in the dissent: "it is not the degree of nervousness that allows the officer to pat a defendant down, but instead it is the articulation by the officer of specific reasons why the nervousness displayed by the defendant caused the officer to reasonably believe that his or her safety would be compromised." *Id.* ¶ 34 (Pickard, J. dissenting); *see also United States v. Millan–Diaz,* 975 F.2d 720, 722 (10th Cir.1992) ("It is common knowledge that most citizens ... whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness."). Based on the testimony in this record, Officer Roberts reasonably could have believed that Swanson and Vandenberg demonstrated more than "simple nervousness," and that their behavior was different from what one normally expects at a simple traffic stop.

{32} We also emphasize the principle, self-evident though it may be, that a routine traffic stop is just that: routine. Ordinarily, "routine" means that an officer may not constitutionally perform a protective frisk for weapons during a traffic stop. It is only

---

**2.** We agree, of course, with Justice Minzner that an officer must have a reasonable suspicion that a suspect is armed and dangerous "at the inception of the frisk." *Infra* ¶ 64 (citing *Terry,* 392 U.S. at 20, 88 S.Ct. 1868). We rely in this opinion on those preludial facts to justify Officer Roberts' frisk.

when the traffic stop ceases to be routine that a weapons frisk *may* be necessary, assuming that the officer can meet the exacting burden of presenting exigent circumstances, in sufficient detail and with convincing sincerity, to a discerning trial judge.

{33} Circumspectly, our holding is narrow. In this very close case, reasonable concerns for safety, and safety alone, justified Officer Roberts' apprehensions and the protective pat down that followed. This was not a search for evidence. The officers did not try to make a case for suspicion of drug possession, and with good reason. Nothing about the perceived behavior of Defendants would have justified a frisk, much less a full-blown search, for evidence of any crime. *See Cardenas–Alvarez,* 2001–NMSC–017, ¶ 21, 130 N.M. 386, 25 P.3d 225 (holding that questionable but explainable behavior at a border stop did not give rise to reasonable suspicion sufficient to justify search for evidence). More was at stake here than mere evidence.

{34} Traffic stops can be very dangerous. *Maryland v. Wilson,* 519 U.S. 408, 413, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam). The Court of Appeals' dissenting opinion acknowledges that " '[e]ven in routine traffic stops, police may adopt precautionary measures addressed to reasonable fears . . . [due to] the inordinate risks police take when they approach vehicles with persons seated in them . . . .' " *Vandenberg,* 2002–NMCA–066, ¶ 37 (Pickard J. dissenting) (alteration in original) (citing *Lovato,* 112 N.M. at 522, 817 P.2d at 256, but relying on *Mimms,* 434 U.S. at 110–11, 98 S.Ct. 330); *see also Cobbs,* 103 N.M. at 628, 711 P.2d at 905 ("At best, when an officer is merely investigating a traffic offense, he faces an inordinate risk when he approaches a subject seated in an automobile."). Relevant studies yield disturbing results. For example,

> [o]ver the past 10 years, more than 1,000 police officers have been murdered. Approximately 10% of those killings, or about 11 each year, occurred during 'traffic pursuits and stops,' but it is not clear how many of those pursuits and stops involved

offenses such as reckless or high-speed driving, rather than offenses such as driving on an expired license, or how often the shootings could have been avoided by ordering the driver to dismount.

*Mimms,* 434 U.S. at 119 n. 9, 98 S.Ct. 330 (internal citation omitted). Another study indicates that "[i]n 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops." *Wilson,* 519 U.S. at 413, 117 S.Ct. 882. We must assume that reasonably well-trained police officers are equally aware of these statistics, and what they portend for their personal safety during otherwise "routine" traffic stops.

{35} Legitimate concern for officer safety answers another of Defendants' arguments. Defendants protest that the traffic stop was over when Officer Roberts began his frisk, which then exceeded the permitted scope of their detention. According to Defendants, after Officer Roberts completed the traffic citation, all he had to do was hand Swanson a ticket and let him go on his way; there was no need for any further interaction with Defendants, and no need for a protective frisk.

{36} We disagree. Officer Roberts testified that he did not become nervous about his safety until after he observed Defendants' behavior while running the computer check and writing the citation. Our courts have made clear that *"[d]uring* an investigatory stop, when an officer reasonably believes the individual may be armed and dangerous, he or she may check for weapons to ensure personal safety." *State v. Flores,* 1996–NMCA–059, ¶ 17, 122 N.M. 84, 920 P.2d 1038 (emphasis added). Officer Roberts still had to get close enough to hand Swanson the citation. Although his proximity may have been only momentary, the risk to his personal safety was no less real. Therefore, we refuse to draw a bright-line, temporal cut-off point. We decline to say that an investigating officer cannot be in as much danger at the end of a traffic stop as at the beginning, or at least reasonably believe that to be so.

### The BOLO From the First Stop

{37} In reviewing the reasonableness of what Officer Roberts did during the second stop, we cannot confine ourselves solely to the circumstances of that one event. In this case, unlike *Chapman,* Officer Roberts relied to some extent on what Deputy House told him had occurred during the first stop. Officer Roberts testified that "based on what I observed from both individuals as well as the radio transmission I had received from Deputy Benny House, at that time my officer awareness or officer safety heightened quite a bit and I did myself become nervous." When Officer Roberts was asked during the suppression hearing whether he would have called for backup if he had never received the BOLO from Deputy House, he responded "[p]robably not. It would have had to be a little bit more on my particular stop to actually get me to call for some back up." Inexplicably, Officer Roberts was never asked whether he would have demanded a weapons frisk without the information in the BOLO.

{38} As a general· proposition, an officer may reasonably rely on information obtained from a BOLO. *Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). A BOLO may provide sufficiently reasonable suspicion for an investigatory stop, if the information in the BOLO is corroborated by a second officer. *See State v. De Jesus–Santibanez,* 119 N.M. 578, 581, 893 P.2d 474, 477 (Ct.App.1995) ("The description of the vehicle, the time and direction of travel, the route traveled by the vehicle, and the origin of the vehicle's license plate, all matched the specific information given by the BOLO or reasonable inferences drawn therefrom. This is sufficient to provide reasonable suspicion for an investigatory stop.").

{39} However, "an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Whiteley,* 401 U.S. at 568, 91 S.Ct. 1031; *see also State v. Taylor,* 60 Wis.2d 506, 210 N.W.2d 873, 880 (1973) (concluding that an officer who reasonably relies on a police dispatch has legal justification to stop a car, but this reliance "does not legitimatize the arrest

in a legal sense or authorize any search incident thereto"). If Deputy House obtained information illegally and then passed it along to Officer Roberts, who relied on that information in his own assessment of Defendants' behavior, then a motion to suppress may have been in order. Accordingly, we must analyze the first stop and the circumstances that led to Deputy House's BOLO alert.

### Legality of the First Stop

{40} In New Mexico, a license plate must be securely fastened "in a place and position so as to be clearly visible." NMSA 1978, § 66–3–18(A) (1998). Deputy House stopped Vandenberg and Swanson under the mistaken belief that the vehicle was being driven without a license plate. Defendants argue that it was improper for Deputy House to ask for Swanson's driver's license, proof of insurance, and vehicle registration once he realized that the 1975 Monte Carlo did have a license plate. Defendants characterize Deputy House's request as unreasonable, because "modest effort would have shown his perception to have been mistaken." This argument ignores New Mexico precedent.

{41} The case at hand is very similar to *Haywood,* in which the officer stopped the suspect's vehicle because he believed that the car was being driven without a license plate or temporary tag. 1998–NMCA–029, ¶ 3. Once the vehicle was stopped and the police officer was two or three feet from the rear of the vehicle, he realized that the car had a temporary tag. *Id.* The temporary tag was difficult to see because the windows were so darkly tinted. *Id.* ¶ 12. In determining whether it was reasonable for the officer to ask for identification and proof of insurance, even after he realized that the vehicle had a temporary tag, the Court of Appeals relied upon the reasoning of our opinion in *State v. Reynolds,* 119 N.M. 383, 388, 890 P.2d 1315, 1320 (1995): "In *Reynolds,* [the Supreme Court] held that generally, whenever a driver is validly stopped for whatever reason, it is reasonable for the officer to ask for identification (driver's license) and proof of insurance." *Haywood,* 1998–NMCA–029, ¶ 13 (citing *Reynolds,* 119 N.M. at 388, 890 P.2d

at 1320). The court in *Haywood* relied upon the reasoning of *Reynolds* to "hold that the de minimis detention of [the defendant] ... was not unreasonable and did not violate the Fourth Amendment of the United States Constitution." *Haywood*, 1998–NMCA–029, ¶ 13.

■ {42} In the present case, no photos or other kinds of demonstrative evidence were placed in evidence at trial to refute Deputy House's testimony that the license plate was not clearly visible. Therefore, despite Defendants' remonstrations, we must defer to the district court and its conclusion that Deputy House spoke truthfully about his reason for stopping Defendants. Even though Deputy House was mistaken, the reasoning of *Haywood* and *Reynolds* leads us to conclude that Deputy House made a lawful stop, during which he could detain Defendants briefly to check the driver's documentation.

### Defendants' Refusal of the Canine Sniff and Observations of Their Behavior

{43} After Deputy House ran the license inquiry, he told Defendants they were free to go. At that moment, Deputy Hill arrived on the scene, and Deputy House requested Swanson's consent for a canine sniff of the exterior of the car. Defendants asked if they had to comply with the canine sniff, and Deputy House told them they did not. Swanson refused, and Deputy House allowed them to continue on their way. Deputy House then sent a BOLO and communicated directly with Officer Roberts about what he had observed of Defendants' behavior, including their perceived nervousness while re-fusing the canine sniff. Deputy House testified:

> I gave [Officer Roberts] a description of the vehicle. I told him about the nervousness, and I did advise him that [Defendants] did deny consent for me to have Officer Hill walk a dog around.

{44} We must consider whether any of this information was passed along to Officer Roberts unlawfully, or whether Officer Roberts' reliance on the BOLO information contaminates the weapons frisk that followed.[3] More than one question comes into play. The first is whether any provision under the Constitution or laws precludes Deputy House from observing Defendants' behavior while he requested their permission for the canine sniff and while Defendants lawfully refused him. Then, having noted Defendants' nervousness and refusal to make eye contact, is there any constitutional or other legal reason why Deputy House may not pass his observations on to Officer Roberts? Notably, Deputy House articulated only his observations and impressions; he thought Defendants were acting suspiciously. He did not pass judgment on whether Defendants possessed drugs or were likely guilty of some other crime. Deputy House had no reasonable suspicion to detain Defendants any longer and did not do so. He did not ask Officer Roberts to detain Defendants, knowing that he could no longer do so. He merely shared his impressions with another law enforcement official.

■ {45} The law does not require Deputy House to turn a blind eye to safety considerations that may later come into play

3. The parties did not address in their briefs whether Deputy House's request to conduct a canine sniff around the vehicle improperly exceeded the scope of the first traffic stop. *See State v. Williamson*, 2000–NMCA–068, ¶ 8, 129 N.M. 387, 9 P.3d 70 (concluding that the officer did not exceed the scope of the traffic stop when, after legally arresting and discovering drugs on a passenger, the officer asked the driver about drugs and whether he would consent to search); *Taylor*, 1999–NMCA–022, ¶¶ 20–21 (holding that although an officer's suspicions may broaden during an investigatory stop to include matters outside the initial stop, an officer was not entitled to ask about drugs and alcohol during a traffic stop when the purpose of the stop was to investigate littering and larceny and the officer did not have reasonable suspicion that additional criminal activity was involved); *Haywood*, 1998–NMCA–029, ¶¶ 15–16 (same). Our research indicates that Defendants never challenged the scope of the first traffic stop on this basis before the district court, and it is self-evident that no such issue was ever raised before the Court of Appeals. Thus, the parties have not preserved any challenge to the request for the canine sniff, and the use of any information obtained therefrom, on the ground that it unconstitutionally exceeded the scope of an otherwise valid traffic stop. We exclude that argument from our consideration of the BOLO and Officer Robert's use of that information in deciding to conduct a weapons frisk.

and endanger another officer. What an officer legally observes, he may take note of, and what he notes, he may pass along to his fellow officers. Defendants' lawful exercise of his right to refuse a canine sniff[4] did not preclude Deputy House from sharing the relevant information gleaned in the course of that exchange. *United States v. Hyppolite,* 65 F.3d 1151, 1158 (4th Cir.1995) (holding "that although there may be some cases where the form of a suspect's assertion of rights may support a finding of probable cause, officers and magistrates cannot rely *solely* on the form in which a suspect asserts constitutional rights to establish probable cause "); *United States v. Carter,* 985 F.2d 1095, 1097 (D.C.Cir.1993) (stating that "[t]he detective could reasonably take [the defendant's peculiar] conduct into account, as part of the totality of the circumstances, regardless whether it occurred before, or, as here, after [the defendant] had given and then withdrawn his consent to a search"); *United States v. Wilson,* 953 F.2d 116, 126 (4th Cir.1991) (noting that the court was "not prepared ... to rule that the form of a denial can *never* be included as a factor to be considered in determining whether an investigative stop was justified"); *United States v. Riley,* 927 F.2d 1045, 1050 (8th Cir.1991) (concluding that when determining whether officers at an airport in Little Rock had reasonable suspicion, it was proper for the officers to consider, within the totality of the circumstances, that the defendant became "nervous and guarded" when detectives at an airport in Los Angeles pressed for permission to search the defendant's luggage and permission was denied); *People v. Haley,* 41 P.3d 666, 676 (Colo.2001) (stating that the defendant's "conduct in reluctantly agreeing to a search of the luggage and refusing to consent to a search of the car is not a circumstance supporting reasonable suspicion"); *cf. Karnes v. Skrutski,* 62 F.3d 485, 495–96 (3d

Cir.1995) (concluding that the defendant's right to refuse consent cannot be considered to determine reasonable suspicion, even if the defendant "became argumentative and difficult").

{46} The harder question is whether Deputy House's inclusion of a neutral fact in the BOLO—the refusal of the canine sniff—necessarily contaminated Officer Roberts' later opinion that his safety was in danger. Keeping in mind that for purposes of this opinion we draw no distinction between a refusal of a search and a refusal of a canine sniff, we think it self-evident that Defendants' refusal is not a probative fact of guilt, suspicion, or dangerousness. *See Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[A person] may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds."). Defendants' refusal should not be considered in determining whether Officer Roberts had reasonable and articulable suspicion that Defendants were armed and dangerous. *See Garcia v. State,* 103 N.M. 713, 714, 712 P.2d 1375, 1376 (1986) (concluding that the defendant's refusal to consent could not be used as evidence of guilt at trial because " '[i]f the government could use such a refusal against the citizen, an unfair and impermissible burden would be placed upon the assertion of a constitutional right' " (quoting *United States v. Prescott,* 581 F.2d 1343, 1351 (9th Cir.1978))); *State v. Zelinske,* 108 N.M. 784, 788, 779 P.2d 971, 975 (Ct.App.1989) ("We hold that, under these circumstances, defendant's withdrawal of consent, either by itself or when added to the other circumstances known to the offi-

---

4. An individual does not have a legitimate expectation of privacy in the odors coming into a public place, *State v. Cleave,* 2001–NMSC–031, ¶ 12, 131 N.M. 82, 33 P.3d 633, and therefore a canine sniff of the exterior of a car is not a "search" within the meaning of the Fourth Amendment. *State v. Villanueva,* 110 N.M. 359, 361, 796 P.2d 252, 254 (Ct.App.1990). Because an exterior canine sniff does not implicate

Fourth Amendment rights, then arguably one would have no protected right to refuse consent, and the police could draw a relevant inference from that refusal. However, for purposes of this opinion, we need not decide that question because we ultimately decide that no improper inferences were drawn, whether or not Defendants had the right to refuse.

cers, did not provide probable cause."),[5] *overruled on other grounds by State v. Bedolla,* 111 N.M. 448, 455, 806 P.2d 588, 595 (Ct.App. 1991); *United States v. Wood,* 106 F.3d 942, 946 (10th Cir.1997) ("The failure to consent to a search cannot form any part of the basis for reasonable suspicion."). *See generally* Kenneth J. Melilli, *The Consequences of Refusing Consent to a Search or Seizure: The Unfortunate Constitutionalization of an Evidentiary Issue,* 75 S. Cal. L.Rev. 901, 937 (2002) (arguing that evidence of refusal to consent is usually inadmissible, not necessarily because it punishes one for assertion of a constitutional right, but because refusal to consent is not probative of guilt or suspicion and is therefore irrelevant).

{47} When Defendants refused the canine sniff, their conduct was a neutral act which neither incriminated nor exculpated them. Therefore, in determining whether Officer Roberts had reasonable suspicion to believe that Defendants were dangerous, we do not consider Defendants' refusal to consent as a relevant fact. *Cf.* Racheal Karen Laser, Comment, *Unreasonable Suspicion: Relying on Refusals to Support Terry Stops,* 62 U. Chi. L.Rev. 1161, 1161 (1995).

{48} We look to the remaining facts in the BOLO to determine whether Officer Roberts was reasonable in his belief that Defendants were dangerous. *See Snow v. State,* 84 Md.App. 243, 578 A.2d 816, 824 (Ct.Spec.App.1990) (holding that the court could not consider the defendant's refusal to consent, but could continue its analysis by determining whether the remaining facts collectively met the reasonable and articulable suspicion standard). In formulating a reasonable suspicion that Defendants might be armed and dangerous, Officer Roberts did not rely solely on the neutral fact that Defendants refused consent. Nothing in Officer Roberts' testimony indicates that he feared for his safety because Defendants refused

the canine sniff or that he drew any negative inferences from that specific fact. *Cf. id.* (stating the officer "indicated that the fact that [the defendant] failed to consent to the required search cinched his decision to conduct the search").

{49} Instead, Officer Roberts relied upon his own observations coupled with the inferences he drew from the BOLO, and the BOLO contained information regarding Defendants' demeanor, corroborated by Officer Roberts' own observations, in addition to the refusal to consent. When we have already determined that Officer Roberts had sufficient, objective reasons to be concerned for his safety, it would be unreasonable for us to suppress the fruits of those suspicions, solely because the information available to the officer included one, irrelevant fact. The weight of the case law does not require it, and neither does a healthy sense of proportionality.

{50} Our opinion would be very different if Defendants had established that the officers' claims were pretextual, fabricated as a means of retaliating against them for the exercise of their constitutional rights. However, there was sufficient evidence in this record for the district court to conclude that the officers were not so motivated. Assuming Officer Roberts acted in good faith, we hold that his actions were reasonable under the circumstances of this case.

## New Mexico State Constitutional Claims

{51} The Court of Appeals majority opined in a footnote, without exposition, that Article II, Section 10 of the New Mexico Constitution "provides an adequate and independent ground for suppressing the evidence seized by Officers Roberts and Yost." *Vandenberg,* 2002–NMCA–066, ¶ 25 n. 3. On certiorari, the State questions whether any state constitutional claim was ever preserved and

---

5. We endorse the following quote from *Zelinske:* "If we were to hold that withdrawal of consent to search by ambiguous words and conduct constitutes a permissible factor for probable cause, we would then be faced with the necessary extension: refusal to consent to intrusion in the first instance could also authorize a warrantless search from the outset of the investigation. If refusal to consent could be a factor for probable cause, an officer who had some suspicion, but less than probable cause, could merely request permission to search and, no matter what the answer, could then proceed to search without a warrant. Such a result would be clearly contrary to the mandates of the fourth amendment." 108 N.M. at 788, 779 P.2d at 975.

whether the Court of Appeals' opinion adequately articulated an interstitial analysis, as required by New Mexico law to support an independent claim under our state constitution. *See Gomez*, 1997–NMSC–006, ¶¶ 22–23. Defendants argue that a state constitutional claim was preserved, and that because the Court of Appeals decided the case under the Fourth Amendment of the United States Constitution, a complete analysis on state constitutional grounds was neither required nor appropriate.

{52} We must first determine whether any state constitutional argument was preserved, as required by Rule ·12–216(A) NMRA 2003 ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked."). In analyzing preservation, we look to the arguments made by Defendant below. Defense counsel's motion to suppress argued that evidence seized must be suppressed pursuant to the federal and state constitutions, because the "unlawful search was pretextual and did not fit within the protective weapons frisk exception." Defense counsel argued that the second stop and Officer Roberts' weapons frisk were pretextual, because the real reason Officer Roberts stopped Defendants and ordered them out of the car was to search them for contraband, and not because of speeding or concerns for officer safety. Defense counsel argued at the suppression hearing that, "the U.S. Supreme Court doesn't care whether something is pretextual or not [and that] any excuse will sell in federal court .... [He also noted that] the State of New Mexico hasn't followed that line at all [and that] a pretextual stop is a violation of *Terry* ...." In their briefs to this Court, Defendants argued for a different analysis of the importance of pretext under our state constitution.

{53} The premise for Defendants' state constitutional claim is that Officer Roberts was acting out of ulterior motives, and that if so, the consequences of pretext should be different under our state constitution than under the federal constitution. However, the district court believed Officer Roberts, as it was entitled to do, and did not find anything pretextual about either Officer Roberts' stop or the protective frisk. The district court concluded; "I'm not convinced Officer Roberts lied about speeding as the basis for his stop and if speeding occurred, then that is reasonable suspicion and the officer provided evidence supporting reasonable suspicion for his stop." Therefore, even assuming we were to adopt Defendants' argument about the consequences of officer pretext under the state constitution, that argument finds no factual foundation in this case; it presents an abstract question, which we do not decide.

{54} Defendants make no other arguments below for a different approach under the New Mexico Constitution, and accordingly, we do not decide any such arguments raised for the first time on appeal.

## CONCLUSION

{55} We hold that Officer Roberts' frisk for weapons did not violate the Fourth Amendment. Therefore, we affirm the district court and reverse the Court of Appeals.

{56} **IT IS SO ORDERED.**

MAES, C.J., and SERNA, J., concur.

MINZNER and CHAVEZ, JJ., dissenting.

MINZNER, Justice (dissenting).

{57} While there is much in the majority opinion with which I agree, I must respectfully dissent from the holding in this case. I agree with the standard of review stated in ¶¶ 17–19 for motions to suppress, with the analysis of the validity of the second stop in ¶ 21, and with the test stated for analyzing a frisk in ¶ 22. I particularly agree that "[t]o justify a frisk for weapons, [an] officer must have a sufficient degree of articulable suspicion that the person being frisked is both armed *and* presently dangerous." Majority Op. ¶ 22. Finally, I agree generally with the principle stated in ¶ 23 that we must balance an individual's constitutional right to be free from an unreasonable search and seizure against a law enforcement officer's responsibility to investigate crime and to be protected against unreasonable risks of injury in the course of an investigation. As applied to the facts of this case, however, for the reasons that follow, the relevant principles seem to me to support Defendants' motions to sup-

press. Consequently, I would not address the validity of the first traffic stop, *see id.* ¶¶ 40–50, nor claims under the New Mexico state constitution, *see id.* ¶¶ 51–54.

{58} As for the justification of the *Terry* patdown, I do not believe that the evidence presented warranted a frisk for weapons. The majority does not identify any evidence that Officer Roberts actually suspected Defendants were armed, but rather concludes that he "reasonably could have considered Defendants to be armed and dangerous, justifying a protective frisk for weapons." *Id.* ¶ 30. I question whether we should rely on what he might have suspected, rather than first determining what he suspected, next determining whether what he suspected would have justified a frisk for weapons, and finally determining whether he had a "sufficient degree of articulable suspicion" to support a frisk. *Id.* ¶ 22. In this case, however, we seem to be requiring only that the officer have expressed a concern for his safety and that he might have thought Defendants were armed and dangerous. I respectfully submit that would be a significant change in the expression of the rule and thus an important change in existing law.

{59} We do not have circumstances in this case that justify a new exception nor support the disposition under the federal constitution. In *Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), which was decided on the same day as *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that "[i]n the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which he [or she] reasonably inferred that the individual was armed and dangerous." An officer's concern about safety, without specific articulable facts that provide reasonable suspicion that someone has a weapon, is an insufficient basis for a *Terry* frisk. *See Ybarra v. Illinois,* 444 U.S. 85, 92–93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (holding that "a reasonable belief that [the defendant] was armed and presently dangerous [is] a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons"). As recognized by the majority, Ma-

jority Op., ¶ 21, under *State v. Cobbs,* 103 N.M. 623, 711 P.2d 900 (Ct.App.1985) and *State v. Lovato,* 112 N.M. 517, 817 P.2d 251 (Ct.App.1991), in some cases the right to conduct a protective search arises from the inherently dangerous nature of the suspected criminal activity. In this case, however, the only crimes suspected were traffic law violations and perhaps possession of illegal narcotics, which are not inherently dangerous crimes.

{60} It is therefore under the standard stated by the majority that we must analyze the facts of this case. I am willing to assume for purposes of this appeal that Officer Roberts' testimony should be understood as testimony that he was nervous about his safety because he suspected one of the Defendants might have been armed and if armed would be dangerous. Nevertheless, there is nothing in his testimony to provide a reasonable basis under the relevant cases for the suspicion that one of the Defendants was armed. I agree that *State v. Chapman,* 1999–NMCA–106, ¶ 2, 127 N.M. 721, 986 P.2d 1122, is difficult to distinguish. *See* Majority Op., ¶¶ 27–30. I would not describe it as "particularly helpful," *id.* ¶ 27, however, but as troublesome. I do think it can be distinguished and believe that it ought to be.

{61} In *Chapman,* after the officer stopped the defendant for a traffic violation and had asked for the defendant's identification,

> Defendant would not make eye contact with the deputy. When defendant handed his driver's license to the deputy, defendant's hand was shaking. *The deputy then had Defendant exit his vehicle.* Because the deputy noticed that Defendant was becoming increasingly nervous, *he asked Defendant if he had any weapons.* Defendant told the deputy that he did not have any weapons. Then, in a higher-pitched voice, *and in a nervous and aggressive manner,* Defendant asked 'what this was all about.' The deputy characterized Defendant's tone of voice and questioning at that point as hostile, nervous, and aggressive. The deputy then asked Defendant whether he had any drugs, drug paraphernalia, or needles on him. The deputy

asked this because he was afraid of getting stuck with a dirty needle if he conducted a patdown search. With this question, Defendant's body began to shake. The deputy asked Defendant to place his hands on the car. Defendant complied, but his hands were shaking so furiously that he was unable to keep them steady. At this point, the deputy, who had no backup, became concerned about his own safety and decided to conduct a patdown search for weapons to protect himself.

*State v. Chapman,* 1999–NMCA–106, ¶ 2 (emphasis added). The officer did not rely solely upon the nervousness of the defendant to support his frisk, and he mentioned a weapon of which he was fearful. After he asked the defendant if he had any weapons and observed the defendant's nervous and aggressive behavior in response, the officer developed a reasonable suspicion that the defendant might be armed and dangerous.

{62} The Court of Appeals majority opinion distinguished *Chapman* from the present case by the degree of nervousness observed by the arresting officer.. *State v. Vandenberg,* 2002–NMCA–066, ¶ 25, 132 N.M. 354, 48 P.3d 92 ("[Defendants'] behavior . . . came nowhere near the panicked and aggressive behavior observed by the officer in *Chapman.*"). I believe, however, *Chapman* is more appropriately distinguished by the fact that the officer in that case could relate a concern for his own safety to the answer to the question he asked the defendant about the possession of weapons. Conversely, in this case, Officer Roberts asked Defendant Swanson if he was carrying any weapons and after Defendant Swanson answered "no," he immediately ordered him to submit to a frisk. Majority Op., ¶ 10. The frisk was not automatically justified simply because Officer Roberts asked Defendant Swanson if he had any weapons. *See City of Albuquerque v. Haywood,* 1998–NMCA–029, ¶ 17, 124 N.M. 661, 954 P.2d 93 (holding that the defendant's simple answer "yes" to whether he had a gun did not automatically justify further detention or a frisk for weapons).

{63} I appreciate the majority's analysis of *Chapman* and the acknowledgment that "[i]mportantly, the officer in *Chapman* pro-

ceeded incrementally before frisking the suspect for weapons." Majority Op., ¶ 26. As the majority explains, it is not nervousness alone that justifies a frisk for weapons, it is nervousness and other specific articulable observations "placed in context." *Id.* ¶ 28.

{64} I am troubled, however, by how the majority attempts to equate the facts in *Chapman* with the facts in this case by explaining that in each case, "the situation gradually escalated." *Id.* ¶ 30. In *Chapman* the officer could connect the defendant's increased nervousness with his answer to the officer's question of whether the defendant had any weapons and so establish a basis for a belief that the defendant might have a weapon. *See United States v. Holt,* 264 F.3d 1215, 1224 (10th Cir.2001) (en banc) ("Officers have become skilled at detecting nervous or evasive responses from which the officer may gain valuable clues about a motorist's intentions. Thus, even a denial may alert the officer that the denial may not be truthful and thus that the officer should take greater care."). In this case, Officer Roberts made no observations as to Defendant Swanson's behavior in responding to his question. Instead, Officer Roberts immediately ordered the frisk after Swanson said that he had no weapons. Notwithstanding Swanson's furtive motions and evasive behavior after he was ordered to submit to the frisk, Majority Op., ¶ 30, the unanswered question is what basis Officer Roberts had for suspecting that Defendants were armed at the time he ordered the frisk.

{65} An officer must have a reasonable suspicion that a suspect is armed and dangerous at the inception of the frisk. *Terry,* 392 U.S. at 20, 392 U.S. 1. "The officer cannot rely on facts which arise as a result of the encounter." *State v. Jason L.,* 2000–NMSC–018, ¶ 20, 129 N.M. 119, 2 P.3d 856; *United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948) ("a search is not to be made legal by what it turns up"). I do not believe that Defendant Swanson's actions after he was ordered to submit to the search are relevant in answering this question. *See United States v. Johnson,* 267 F.Supp.2d 1072, 1078 (D.N.M. 2003) (holding that the defendant's admission that he had a

gun could not be used to support grounds for officer's reasonable suspicion to justify a frisk because the officer had already advised the defendant that he was going to conduct a patdown frisk); *see also People v. Collins*, 1 Cal.3d 658, 83 Cal.Rptr. 179, 463 P.2d 403, 407 (1970) ("If merely posing an objection to a search were sufficient to provide justification for a more extensive intrusion upon defendant's personal security, the right to be free from unreasonable police intrusions would be vitiated by its mere assertion." (internal quotation marks and quoted authority omitted)).

{66} It seems to me that part of the "incremental" process present in *Chapman* is lacking in the present case. The part that is missing is a development of a reasonable suspicion before ordering a frisk for weapons. Perhaps another way of stating my disagreement with the majority as narrowly as possible is to say I think *Chapman* needs to be viewed even more narrowly. I think the Court of Appeals in this case did that. To rely on *Chapman* to reverse the Court of Appeals in this case seems to me not only wrong, *see e.g. State v. Pierce*, 77 P.3d 292, 296, ¶ 12 (2003) (holding that even extremely nervous and fidgety behavior without more does not justify a *Terry* patdown); *State v. Duran*, 76 P.3d 1124, 1129, ¶ 19 (2003) (confirming that an officer's training and experience must actually result in articulable observations justifying an additional investigation), but unnecessary, although limiting *Chapman* is, as we all agree, difficult. To rely on it to reverse in this case, however, seems to me to limit Defendants' federal constitutional right to be free from an unreasonable search and seizure as well as create a new exception from the general requirement that a search requires a warrant.

{67} Through this analysis I do not wish to suggest that Officer Roberts was not without any justifiable response to belie his fears once he observed Defendants' nervousness. "If the *Terry* test for a frisk cannot be met, this does not mean that the officer is powerless to do anything in the interest of self-protection." 2 Wayne R. LaFave et al., Criminal Procedure, § 3.8(e), at 250 (2d. ed.1999). When there is no showing that the

suspects are armed, the officer may still require the suspects to get out of the car to diminish the possibility that they can make unobserved movements. *See Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *see also* LaFave et al., § 3.8(e), at 250. This was the procedure employed by the arresting officer in *Chapman*. Furthermore, Officer Roberts was justified to ask Defendant Swanson whether he had any weapons. *See Holt*, 264 F.3d at 1226 ("Given the dangers inherent in all traffic stops, we hold that the government's interest in officer safety outweighs a motorist's interest in not being asked about the presence of loaded weapons.").

{68} I agree with the majority that this is a very close case. I also recognize the difficulty in second-guessing an officer's decision to protect him or herself when that officer is confronted with a potentially life threatening situation. The *Terry* exception allows officers to search or seize a suspect under a reasonable suspicion that the suspect is armed and dangerous. We apply an objective standard to this reasonableness in order to maintain the exception as an exception and to protect the individual's rights to be free from warrantless searches except in exceptional circumstances. For these reasons, I would affirm the Court of Appeals' opinion. A majority of the Court concluding otherwise, I respectfully dissent.

CHÁVEZ, J., concurs.

CHÁVEZ, Justice (dissenting).

{69} I concur in every respect with Justice Minzner's dissenting opinion; I agree that the State did not meet its burden at the trial level of establishing facts supporting the reasonableness of the warrantless search of Defendants' persons during the second stop. *See State v. Paul T.*, 1999–NMSC–037, ¶ 10, 128 N.M. 360, 993 P.2d 74. Like Justice Minzner, I conclude that the officers' testimony, when tested under an objective standard, failed to establish a reasonable suspicion that Defendants were both dangerous *and* armed. While the majority opinion arguably makes a case for Defendants' nervousness giving rise to a suspicion of dangerousness, the facts of this case fall short of

establishing a reasonable suspicion that they were armed. The United States Supreme Court requires a reasonable suspicion that a defendant is both dangerous and armed, and we are compelled to follow such precedent. *See Cockrell v. Bd. of Regents,* 2002–NMSC–009, ¶ 27, 132 N.M. 156, 45 P.3d 876.

{70} I would add to Justice Minzner's analysis three other pieces of evidence relevant to the totality of the circumstances: (1) the testimony of Officer Roberts that he did not see evidence of weapons or have any concern for his safety during his initial approach of the vehicle; (2) Officer Yost's testimony that while positioned near the passenger door she observed the occupants' movements while in the car and did not see evidence of weapons; and (3) Officer Roberts' testimony that prior to returning to the car to issue a warning citation, he had already made the decision to frisk for weapons, rendering any observations made after that point irrelevant to whether his decision to frisk for weapons was legitimate.

{71} Officer Roberts testified that when he first approached Defendants, he asked the driver to produce a driver's license, registration and proof of insurance. He observed the driver reach in the glove box for the documentation and also observed the driver reach into his hip pocket for a wallet, retrieve his license from the wallet, and hand it to him. The officer's testimony was clear that at this point he did not see evidence of a weapon and did not have any concern for his safety, although the occupants appeared nervous and commented that they had been stopped just five minutes earlier and everything had checked out.

{72} Officer Yost, who heard the BOLO from Deputy House like Officer Roberts, also altered her path of travel to look for Defendants. She admitted that she was looking for a reason to stop them. She passed Defendants on the highway and made a U-turn to catch up with them. When she arrived at the scene, she positioned herself next to the passenger door. She, too, perceived Defendants to be more nervous than one might ordinarily expect. However, her observations of Defendants while Officer Roberts was seated in his vehicle are instructive.

She observed movement in Defendants' car, including the passenger reaching in the glove box, but did not observe any weapons in the glove box. Her testimony, therefore, tended to dispel at least one of the two requirements set forth by the United States Supreme Court for conducting a frisk for weapons— that the officer have a reasonable suspicion the individuals are armed.

{73} Finally, I note that the majority relies on events occurring after the point Officer Roberts announced that he was going to conduct the frisk in order to support his decision to frisk for weapons. Majority Opinion ¶ 30. This reliance, I believe, is misplaced. In fact, Officer Roberts testified that he made the decision to frisk the defendants *before* returning to the car a second time to issue a warning citation. Thus, even looking at the evidence in the light most favorable to the State, the majority is left with the Officers' observation of Defendants drumming their fingers on the rooftop, speaking with one another, rolling the windows up and down, and looking back toward Officer Roberts as the only facts which could arguably support an inference that defendants were armed and dangerous. When judged objectively, these facts are simply insufficient to justify the patdown search.

{74} I also agree with Justice Minzner that, given her analysis and conclusion that the motion to suppress should be granted, discussion of the first stop ought to be unnecessary. Since, however, the State and the majority rely on the BOLO from the first stop to justify the frisk for weapons, analysis of the validity of the first stop is required. I write separately because, in my opinion, the first stop was not supported by an objectively reasonable suspicion and thus, likewise, violated the Fourth Amendment. In this respect my dispute with the majority opinion is quite narrow. In deference to our role as an appellate court, I, like the majority, accept the trial court's credibility determination that Deputy House initially suspected that Defendant was driving a car with a missing license plate. As to the purely legal question of whether or not that suspicion was objectively reasonable, however, I agree more with the

Court of Appeals' opinion than with ¶¶ 40–50 of the Majority Opinion.

{75} Under our jurisprudence, an officer may briefly detain an individual to investigate potential criminal activity without probable cause to make an arrest when that officer has a reasonable suspicion that the law has been or is being violated. That reasonable suspicion is tested under an objective standard; that is, courts must determine whether "the facts available to the officer [would] warrant the officer, as a person of reasonable caution, to believe the action taken was appropriate[.]" *State v. Madsen,* 2000–NMCA–050, ¶ 9, 129 N.M. 251, 5 P.3d 573. As the majority notes, we review the trial court's answer to that question de novo. *See* Majority Opinion, ¶ 19.

{76} Deputy House justified his initial stop of Defendants' vehicle to the trial court on the grounds that until "he pulled right up on the vehicle" he could not see a license plate. Indeed, he testified that he explained to the driver that he needed to move the license plate up to where it was visible. This recommendation was striking, given the testimony of Officer Roberts, who stopped the defendants just a few minutes later and a few miles away from where Deputy House first stopped the car. Officer Roberts repeatedly and unequivocally testified that it was broad daylight at the time he stopped Defendants and that he could easily see the license plate on the vehicle, which was located on the very spot the manufacturer had designed for it. Furthermore, Officer Roberts testified that not only was the license plate visible, but that he was able to determine that the registration was current from the color of the registration sticker on the license plate *while he was driving down the road.* On these facts, I agree with the trial court that the first stop was "fishy," but I would go further and agree with the Court of Appeals that it was also invalid. Deputy House's initial suspicion, though genuine, was not objectively reasonable; it did not, therefore, justify pulling over Defendants.

{77} The majority opinion faults Defendants for not putting on evidence to establish the fact that the license plate, being in the very spot the manufacturer intended, was not nevertheless improperly obscured under NMSA 1978, § 66–3–18(A) (1998). *See* Majority Opinion, ¶ 42. I am not convinced, however, that the burden to produce such evidence is properly placed on Defendants. Although we are to view the evidence in the light most favorable to the State as the prevailing party below, the State bears the burden of proving specific, articulable facts that, when judged objectively, would lead a reasonable person to believe that criminal activity was occurring. *State v. Taylor,* 1999–NMCA–022, ¶ 7, 126 N.M. 569, 973 P.2d 246. Deputy House's testimony, in my opinion, falls below that requirement. Deputy House's conclusory statement that the license plate was not clearly visible was refuted by the specific, articulable facts testified to by Officer Roberts, including the fact that the license plate was clearly visible in the broad daylight, that the license plate was in the very place the manufacturer intended, and that he could identify the color of the registration sticker while he was driving down the road. I, therefore, do not agree that we should defer to the trial court's legal conclusion that the State established that Deputy House's subjective belief was objectively reasonable.

{78} Furthermore, I agree with the Court of Appeals that Deputy House acted unreasonably in pursuing his initial suspicion by not taking any steps to confirm or dispel it *before* pulling Defendants over and checking the license and registration. *See State v. Vandenberg,* 2002–NMCA–066, ¶ 18, 132 N.M. 354, 48 P.3d 92. In this regard, contrary to ¶ 41 of the Majority Opinion, I do not find that this case is controlled by *City of Albuquerque v. Haywood,* 1998–NMCA–029, 124 N.M. 661, 954 P.2d 93 (Ct.App.1997). In that case, the officer could not determine from the road whether a vehicle had a license plate because it had no permanent tags and the temporary tag was obscured by the tint of the car's windows. In fact, as the Court of Appeals noted, "the windows were so darkly tinted that the temporary tag was not visible until the vehicle was stopped, the officer had exited the vehicle, and was approaching the driver, within two to three feet from the rear of the stopped vehicle." *Id.* ¶ 12. Thus, in

586

that case, the officer could not "verify or quell that suspicion," *id.* ¶ 15, without first stopping the vehicle. By way of contrast, Deputy House and Officer Roberts both testified that they could see the license plate from their vehicles.

{79} In this case, quite unlike in *Haywood*, an investigatory detention was simply unnecessary to dispel Deputy House's initial mistaken suspicion. Even a cursory investigation from the road would have apparently shown to Deputy House, as it did to Officer Roberts, that the car not only had a license plate, but that the registration was current. I do not believe we should allow the police to pull over the car, ask for license and registration, and detain the passengers pending the wants and warrants search in these circumstances. Not requiring such minimal precautions of the police would invite pretextual stops. Requiring it, on the other hand, would maintain a proper balance between protecting individuals' Fourth Amendment interests and promoting the government's legitimate interest in investigating crimes. Our case law requires that our decisions maintain that balance. *See State v. Reynolds*, 119 N.M. 383, 385–86, 890 P.2d 1315, 1317–18 (1995).

{80} Because I conclude that the first stop was invalid, I would not permit the State to rely on the information that Deputy House communicated to Officer Roberts in the BOLO to establish the reasonableness of the patdown search at the second stop. *See generally State v. Ingram*, 1998–NMCA–177, ¶ 10, 126 N.M. 426, 970 P.2d 1151 (discussing exclusionary rule and its effect on the fruits of an unlawful stop). In any event, the information from the BOLO, on which both the State and the majority rely, has de minimis value in the armed and dangerous calculus. Deputy House did not communicate any information to Officer Roberts to indicate that he was concerned about his safety or the safety of other officers. Indeed, the BOLO could not provide any information whatsoever to suggest that Defendants were armed and dangerous, precisely because Deputy House did not perceive them to be. The only logical reason for the BOLO was retribution for Defendants' exercise of their Fourth

Amendment and Article II, Section 10 rights to be free from unreasonable detention. This Court should discourage retribution for the exercise of constitutional rights. Absent the scant information conveyed in the BOLO, Officer Roberts' patdown search of Defendants seems all the more unreasonable.

{81} For these reasons, and for all of the reasons asserted by Justice Minzner in her dissenting opinion, I would affirm the Court of Appeals.