This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v. **No. 34,235**

**DAVID HACKER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Briana H. Zamora, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Charles J. Gutierrez, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Will O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**SUTIN, Judge.**

{1}     Following his provisional guilty plea to possession of a controlled substance and drug paraphernalia, Defendant appeals the district court's order denying his motion to suppress. Defendant contends that private security guards improperly detained and searched him in violation of his constitutional right to be free from unreasonable searches and seizures. He further contends that a law enforcement officer's later pat-down search was patently a search for evidence and was unjustified as a search for weapons. We hold that the district court did not err in denying Defendant's motion to suppress.

**BACKGROUND**

{2}     Evidence at the suppression hearing supports all that follows in this background section. Valor Security is a private security company that pursuant to contract conducted surveillance of the parking areas of Coronado Shopping Center in Albuquerque, New Mexico for the purpose of providing security to the property, as well as visitors and tenants. Valor's standard operating procedures include looking for suspicious, unlawful activity in the parking lot area. The standard operating procedures govern such activities as surveillance, initiating contact with individuals, using handcuffs, and when to follow someone who has left Coronado's property. Valor conducted the training of its guards on standard operating procedures internally.

{3} The Albuquerque Police Department (APD) maintains a substation on Coronado's property. The only significant institutional connection between Valor employees and APD officers is that APD has conducted seven to eight informal training classes annually for Valor guards, including training on narcotic transactions and how to differentiate between types of drugs. In these training sessions, APD does not set Valor's policies, train Valor on issues of state law, or direct Valor guards on how to act.

{4} With respect to the incident in question, Valor observed Defendant riding his bicycle around the Coronado parking lot without entering or leaving the mall. The parking lot had been having a high number of vehicle crimes. Valor observed Defendant enter a silver vehicle, briefly converse with the driver, and engage in a hand-to-hand exchange, all over a period of 30-40 seconds. The driver dropped Defendant off at his bicycle, and Defendant began riding through the parking lot away from the building. Believing that a drug transaction had occurred, a Valor guard followed the vehicle to get a license plate number. Defendant continued to ride his bicycle around the parking lot. Another Valor guard pulled his vehicle in front of Defendant, initiated contact, and asked something along the lines of "what's going on?" Defendant responded, "[w]hat the fuck do you want?" When the guard tried to converse with Defendant, Defendant became "extremely agitated" and began

3

"screaming" statements like "[w]hat the fuck did I do? Leave me alone. I didn't do nothing." Defendant reached with one of his hands to his side in a manner that made the guard feel threatened. The guard secured Defendant's arm by grabbing his wrist and told Defendant to calm down. Defendant started fighting, trying to get away, and trying to run.

{5}   At this point, with two guards present, one guard tried to execute an armbar takedown as Defendant was swinging his other arm either trying to strike the guard, escape, or both. "There was physical contact between the two." When Defendant continued to fight, scream, and yell, the guards took him to the ground and placed him in handcuffs. Defendant was asked if he had any weapons and a security pat-down appears to have been performed. One of the guards made the determination to ban Defendant from Coronado for criminal trespass. The Valor shift supervisor began filling out paperwork and conversing with Defendant to obtain information for the ban. Valor dispatch had called APD in regard to the altercation and potential drug transaction. While the guards waited for APD to respond, one of the guards had a conversation with Defendant regarding the drug transaction. On the subject of quantity, it appears that Defendant admitted to buying drugs from the driver of the vehicle, got more agitated, and began saying "[m]y life is over" multiple times and rocking back and forth. As the supervisor was filling out the paperwork, Defendant

got up and ran southbound off the property. Two guards left the property to find Defendant.

{6} One of the guards found Defendant between an apartment complex and the freeway and told him to stop, but Defendant kept "trying to run." The guard caught up with and grabbed Defendant and both fell to the ground. A second guard arrived, and Defendant was transported to the APD substation at Coronado, where an APD officer, Officer Tapia, was given "a rundown of the situation on what had occurred[,]" which included Defendant's hostile behavior toward the guards.

{7} Officer Tapia asked Defendant "[w]hat's going on?" and Defendant responded, "I made a mistake." After obtaining Defendant's address, Officer Tapia asked Defendant what he was doing in the area, and Defendant responded, "I'm dumb." Officer Tapia Mirandized Defendant, which Defendant invoked. In her testimony, Officer Tapia described her intention toward Defendant as follows: (1) believing that she had possible assault charges, she wanted Defendant's version of the events; (2) if there were assault charges, her intention was to issue a criminal summons; and (3) she intended to issue Defendant a criminal trespass notice for Coronado, then ensure that Defendant left Coronado's property.

{8} Officer Tapia asked Defendant to stand so that she could perform a pat-down for weapons based on her suspicion that Defendant may have been armed. She

attempted the pat-down prior to releasing Defendant from his handcuffs because, as she described, "[g]iven that he had already fought with three security officers that are much bigger than me, I wanted to ensure that I was safe." Officer Tapia testified that if Defendant was "willing to fight with three security officers and run from them, . . . there was a possibility that he did have a weapon on him." She explained that "[g]iven that he had been uncooperative, the suspicious behavior [he] showed, and that he, from my understanding, was uncooperative with mall security throughout their entire contact, I felt that it was a possibility he had a weapon on him." Her intent was to pat Defendant down, complete preparation of a summons, issue and explain the criminal trespass notification, and release him, making sure he left the property.

{9}     As Officer Tapia began the pat-down, Defendant said "I'm so stupid," to which Officer Tapia asked, "You're so stupid?" Unsure of the reason for Defendant's statement, Officer Tapia then stated, "[y]ou know, you've been cooperative with me so far." Defendant then stated, "[m]y life is pretty much over[,]" causing Officer Tapia to ask "[w]hat?" Defendant repeated that his life was pretty much over. Officer Tapia asked why Defendant's life was pretty much over, and Defendant admitted he had drugs and then indicated that they were in his pocket. Officer Tapia asked Defendant if she could take the drugs out, and Defendant said, "[y]eah, go ahead." Officer Tapia

retrieved a black velvet bag containing a glass pipe with residue, a small blue baggy, and a clear plastic baggy containing methamphetamine.

{10} Officer Tapia testified that she did not intend to check Defendant's pocket for drugs because she did not believe that the Valor guard's statement was enough to justify "going into somebody's pocket[.]" She further testified that she would not have retrieved the drugs from Defendant's pocket if he had not consented, and instead, she would have obtained a warrant.

**THE DISTRICT COURT'S DETERMINATIONS**

{11} The district court entered an order containing findings and conclusions with respect to the foregoing background facts. Defendant has not challenged the court's findings. Findings regarding the status of Valor include: (1) None of the Valor guards involved are certified law enforcement officers; (2) Valor is not hired or advised by a state law enforcement agency; (3) Valor policy is not validated or directed by a state law enforcement agency; (4) Valor uses a different radio channel than local law enforcement agencies; (5) APD did not instruct Valor to approach, seize, or chase Defendant on October 26, 2012; (6) State law enforcement agencies did not discourage Valor's behavior because they did not know about it as it relates to this case; and (7) Officer Tapia treated Valor guards as she would treat any civilian when she arrived on scene.

**{12}** Based on *State v. Santiago*, 2009-NMSC-045, 147 N.M. 76, 217 P.3d 89, the district court concluded that Valor was not a state actor. The finding regarding Officer Tapia's pat-down was that "Officer Tapia had reasonable concern for her safety upon initially encountering Defendant[, a]ccording to the [information] she received from [a Valor guard] that Defendant had fought with him, that Defendant had run away from him, and that Defendant was acting in an agitated manner." The court found that Officer Tapia acted reasonably.

**DISCUSSION**

**I.     Detention by Valor Did Not Constitute a Constitutional Violation**

**{13}** There exists no reason for any detailed discussion on this point. Our Supreme Court's *Santiago* decision is directly on point and controlling under the facts presented in the present case. *Id. Santiago* involved the same private security company and the same shopping mall as in the case now before us. *Id.* ¶ 4. The facts in the present case do not fall outside of *Santiago*'s reach. Defendant's argument to the contrary is unpersuasive, in that it fails to significantly distinguish *Santiago* on the facts and it fails to provide any authority to support a view that *Santiago* is not controlling. Applying *Santiago*, we hold that Valor was not a state actor under either an agency theory or a public function theory. *See id.* ¶¶ 29-37.

**II.     Officer Tapia's Pat-Down Did Not Constitute a Constitutional Violation**

8

## A.      Standard of Review and Rules

{14}      This Court's review of a district court's ruling on a motion to suppress involves a mixed question of fact and law. *See State v. Vandenberg*, 2003-NMSC-030, ¶ 17, 134 N.M. 566, 81 P.3d 19. "While deferring to the district court with respect to factual findings and indulging in all reasonable inferences in support of that court's decision, we nonetheless review the constitutional question of the reasonableness of a search and seizure de novo." *State v. Light*, 2013-NMCA-075, ¶ 19, 306 P.3d 534 (internal quotation marks and citation omitted).

{15}      To justify a protective pat-down, the officer "must have a sufficient degree of articulable suspicion that the person being frisked is both armed and presently dangerous." *Vandenberg*, 2003-NMSC-030, ¶ 22 (emphasis omitted). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent officer in the circumstances would be warranted in the belief that [her] safety . . . was in danger." *Id.* ¶ 23 (alteration, internal quotation marks, and citation omitted). Our courts provide significant deference to the judgment of the officer. If reasonable people might differ on the justification for a protective pat-down, "we defer to the officer's good judgment." *Id.* (internal quotation marks and citation omitted).

{16} The evidence indicates that Officer Tapia conducted the pat-down based on what the guards detailed about Defendant's hostile behavior and conduct that led her to believe that Defendant could be armed and dangerous. Further, she conducted the pat-down before she released Defendant from the handcuffs in order to ensure her safety once Defendant was no longer restrained. The district court could reasonably infer and conclude that Officer Tapia's search was for weapons and not, as Defendant argues, "patently a search for evidence" or pretextual. We are not persuaded by Defendant's argument that because Officer Tapia was aware that a guard may have already conducted a pat-down, she had no reasonable basis on which to conduct a pat-down for weapons herself. Under the totality of circumstances, we hold that the district court did not err in determining that Officer Tapia's pat-down for weapons was reasonable.

**CONCLUSION**

{17} We affirm the district court's denial of Defendant's motion to suppress.

{18} **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Chief Judge**

10

_____

**STEPHEN G. FRENCH, Judge**